SOCIETY FOR SAVINGS *vs.* THE CITY OF NEW LONDON.

An act of the Legislature passed in May, 1847, empowered the city of New London to issue bonds to the amount of $100,000, to be loaned, on proper security, to the New London, Willimantic and Springfield Railroad Company, a corporation chartered at the same session, to aid in the construction and completion of its road; the act containing a proviso that it should not take effect *until approved by two-thirds of the electors present at a city meeting held for that purpose and a copy of its doings lodged in the office of the secretary of the state.* A meeting of the city was holden for the purpose of acting on the subject, on the 2d day of March, 1850, another on the 12th of the same month, and another on the 10th day of March, 1852, at each of which a vote was taken upon the question of approval, and the vote in its favor was less than two-thirds. Another meeting was called and holden on the 14th day of April, 1852, at which a vote of more than two-thirds was obtained in favor of the approval. Held, that the power of the city on the subject was not exhausted by its first action, and that the action of the last meeting was a valid acceptance of the power to issue the bonds.

Held also, that the power to accept the act was not lost by the delay, the legislature having limited no time within which the city should act on the subject, and the railroad not being then completed, (the legislature having extended the time for its completion,) and the railroad company having therefore not been in a condition to give the security required by the act.

The bonds, which were payable to bearer, were sold in the market by the railroad company to whom they were delivered, and were purchased by the plaintiffs without any knowledge of the prior unfavorable action of the city. A copy of the proceedings of the last meeting had been duly lodged with the secretary of

the state. Held, that the plaintiffs were not bound to look beyond the certificate thus lodged, and as *bona fide* holders of the bonds, could not be affected by the prior action of the city, even if, against parties differently situated, it might have constituted a valid defense.

The bonds were in the following form :—" This certifies that the mayor, aldermen, common council, and freemen of the city of New London are indebted to the N. L. W. & P. R. R. Co. or bearer, in the principal sum of $1,000, payable to said company or bearer, at the end of fifteen years from the 1st day of July, 1852, with 6 per cent. interest thereon, payable semi-annually on presentation of the annexed interest warrants." (Signed by the mayor and treasurer of the city and sealed with the corporate seal.) Held, that the bonds were negotiable, and that suit could be brought on them in the name of the holder.

The bonds had been publicly sold, with the knowledge of all the inhabitants of the city ; many of them had been deposited with the treasurer of the state by sundry banks, as security for their circulation—one of these banks located in New London having for several years published in a newspaper there a quarterly statement embracing this fact ; and the city had paid the semi-annual interest on the bonds down to July, 1859, and the payments had been reported at the annual city meetings. During all this time no citizen had taken any measures to prevent the sale of the bonds or the payment of the interest, or had given notice of any doubt as to their validity. Held, that the city in these circumstances was equitably estopped from denying the validity of the bonds, against parties who held them in good faith, and that individual citizens and tax payers, having thus acquiesced in the conduct of the city, were equally estopped from denying their validity, so far as their individual rights were concerned.

The statute (Rev. Stat., tit. 3, § 165,) which provides that whenever any amendment of the charter of any corporation shall be made, if not otherwise specially provided, it shall not become operative unless accepted within six months thereafter by the corporation, has no application to such an act as that empowering the city, in this case, to issue the bonds in question.

The act empowered the city to issue the bonds in aid of the New London, Willimantic and Springfield Railroad Company and to deliver them to that company. By an act passed by the Legislature at its next session this railroad company was merged in a new corporation, named the New London, Willimantic and Palmer Railroad Corporation, formed by the union of this company with another organized under an act of the legislature of Massachusetts, the new company taking all the rights and assuming the duties of the former ones. The court found that the new company was substantially the same as the old one. Held, that the city acted legally in voting to issue the bonds for the benefit of the new company, and that they were properly delivered to that company.

Debt, for the interest on thirty-one bonds of the city of New London, the interest being certified by interest warrants appended to the bonds. One of the bonds, with the interest warrant belonging to it, was as follows: the others being like it with only a change of numbers.

*New London City Scrip.*

United States of America, State of Connecticut,—Certificate, No. 38, $1000.

This certifies that the Mayor, Aldermen, Common Council, and Freemen, of the city of New London, are indebted to the New London, Willimantic and Palmer Railroad Company, or bearer, in the principal sum of one thousand dollars, payable to said company or bearer, at the end of fifteen years from the first day of July, 1852, with interest thereon at the rate of six per cent. per annum, payable semi-annually, on presentation and delivery of the annexed interest warrants. In testimony whereof, and pursuant to a two-thirds vote of the city of New London, passed in a city meeting duly warned and held for that purpose, on the 14th day of April, 1852, I have caused this certificate to be executed in the name and on behalf of the Mayor, Aldermen, Common Council, and Freemen, of the said city of New London, under their corporate seal, and to be countersigned by the Treasurer thereof, this 31st day of July, 1852.

ANDREW C. LIPPITT, Mayor.

C. BUTLER, City Treasurer.

*Interest Warrant, No.* 30.

For thirty dollars, being half yearly interest on certificate No. 38, of the city of New London, State of Connecticut, payable on the 1st day of July, 1859, at the Union Bank in said city. $30.

C. BUTLER, City Treasurer.

The defendants pleaded the general issue, with notice of the special matters of defense hereinafter stated. The issue was closed to the court. On the trial the following facts were proved.

The bonds in question were issued by the city of New London under the authority of the following resolution of the General Assembly, passed in 1847:—

" *Resolved by this Assembly,* That the Mayor, Aldermen, Common Councilmen, and freemen of the city of New London,

be and they hereby are authorized and empowered to issue scrip or certificates of debt, in such form as they shall think proper, under their corporate name and seal, pledging the credit of said city, to such an amount, not exceeding one hundred thousand dollars, as shall hereafter be determined by a meeting of said city, warned and held for the purpose, by a vote of two-thirds of the electors present and voting on said question, and the same to deliver to the New London, Willimantic and Springfield Railroad Company, (taking proper security therefor,) to aid in the construction and completion of said railroad ; and the said scrip and certificates of debt which shall or may be issued as aforesaid, shall be obligatory on said city and the inhabitants thereof, to all intents and purposes, and may be enforced and collected in the same manner and to the same extent that debts lawfully contracted by towns in the state are enforced, under existing laws of the state. This resolve shall not have any force or validity in law, until the same shall have been approved by two-thirds of the electors present at a city meeting of the city of New London, duly warned and held for that purpose, and a copy of said doings lodged in the office of the secretary of this state."

The New London, Willimantic and Springfield Railroad Company, referred to in the resolution, was chartered by the General Assembly of this state at the same session. By its charter it was empowered to construct a railroad from the city of New London to Willimantic, and thence to the north line of the state towards Springfield. By a resolution passed in 1848 by the General Assembly, this corporation was empowered to unite with a corporation previously chartered by the legislature of Massachusetts, under the name of the New London, Willimantic and Palmer Railroad Company, and the two corporations to become one under the name of the New London, Willimantic and Palmer Railroad Corporation. This union was soon after made by the two corporations, and was confirmed by a resolution of the General Assembly in 1854. The bonds in question were issued after this union, and were delivered to the new company. The court found that the corporation to which the city issued the bonds was substantially the

same corporation as the New London, Willimantic and Springfield Railroad Company described in the resolution empowering the city to issue the bonds.

A meeting of the freemen of the city, legally warned, was holden on the 2d day of March, 1850, for the purpose of acting upon the question of approving the issuing of the bonds under the authority of the resolution of the General Assembly. The vote was taken by ballot, and resulted in a vote of 344 in favor, and of 284 against the approval, which was less than two-thirds. At another meeting of the city holden for the purpose on the 12th day of March, 1850, another vote was taken by ballot, which resulted in 385 yeas and 357 nays. Another meeting was holden on the 10th day of March, 1852, at which another vote was taken, which resulted in 277 yeas and 277 nays. Another meeting was called to act again on the same subject, and holden on the 14th day of April, 1852, at which another vote was taken, which resulted in 785 votes in favor of issuing the bonds, and 204 against it. This being more than the required two-thirds, the mayor, who presided at the meeting, declared the resolution in favor of issuing the bonds to be adopted, and immediately thereafter a copy of the proceedings of the city meeting, properly certified, was lodged in the office of the secretary of the state. The following votes were passed by the city at this meeting :—

*Voted*, To accept, approve, and adopt the following resolution of the General Assembly of this state, passed May Session, A. D. 1847, authorizing the Mayor, Aldermen, Common Council, and Treasurer of the city, to issue scrip or certificates of debt, &c., viz: [Here follows the resolution of the General Assembly.]

*Voted*, That, as soon as may be after the doings of this meeting accepting the foregoing resolve of the General Assembly shall have been lodged in the office of the secretary of the state, the mayor be and hereby is authorized, empowered and directed to issue scrip, or certificates of debt, payable fifteen years from date, with interest semi-annually at six per cent, in such form as shall seem to him proper, under the corporate name and seal of the city of New London, signed by him,

together with the city treasurer, pledging the credit of the city to the amount of one hundred thousand dollars, and the same to deliver to the New London, Willimantic and Palmer Railroad Corporation, to aid in the completion of their road, and also in forming a connection of their road with the Norwich and Worcester road in Norwich, and with the New Haven and New London railroad, in the city of New London; upon receiving from said corporation, as collateral security for the punctual and full payment by said corporation of the interest and principal of said scrip or certificates of debt, thus delivered to them by the city, as the same shall fall due, a conveyance of all the lands, property and franchises of said railroad corporation, subject only to the prior mortgages of the same, amounting in the whole to the sum of eight hundred thousand dollars; provided that said conveyance shall also contain a provision for the payment, quarterly, into the hands of trustees appointed for that purpose, of twenty-five cents for each through passenger that shall go over their road from New Haven to Worcester or Boston, or from Worcester or Boston to New Haven, to be held by them as a sinking fund, to be applied exclusively to the payment of the principal and interest of said city scrip as the same shall fall due, together with all incidental expenses attending the issue of said scrip; and further, that this grant or vote is upon the express condition that said New London, Willimantic and Palmer Railroad Company shall make, or cause to be made, a connection between their road and the Norwich and Worcester Railroad Company at Norwich, and between their road and the New Haven and New London Railroad Company at New London, by extending their road through Beach street to the depot at the foot of the parade."

Another city meeting was called and holden on the 31st day of July, 1852, in consequence of difficulties in the way of immediately forming the connection with the Norwich and Worcester railroad, required by the vote of April 14th, 1852, and of some doubt as to the construction of that vote in other respects, at which the following vote was unanimously passed.

" *Voted*, That the mayor be and he is hereby instructed and directed to issue and deliver to the New London, Willimantic and Palmer railroad company, on receiving from said company the security called for by the vote passed at a city meeting held on the 14th day of April last, of the scrip or certificates of debt named in said vote to the amount of seventy-five thousand dollars, when the connection shall be made at New London, or directors of the road shall give their personal guaranty, to the satisfaction of the mayor, that said connection shall be made within sixty days."

By the resolution of the General Assembly, the city was empowered to issue the bonds only for the purpose of aiding the railroad company to " construct and complete " its road. By the charter of the New London, Willimantic and Springfield Railroad Company, the company was required to complete its road within four years from the granting of the charter ; which period expired in 1851. In 1851, a further period of two years was allowed by the General Assembly to the corporation as it then existed, as the New London, Willimantic and Palmer Railroad Corporation, for the completion of the road. The court found that, in the interval, no changes had taken place materially affecting the objects for which the issuing of the bonds had been authorized, and which would, in any reasonable probability, have varied the opinion of the legislature on the subject ; that the railroad was not completed at the time of the issuing of the bonds ; that the issuing of the bonds was necessary for the completion of the road ; and that the vote of the city, directing the issuing of the bonds, was within a reasonable time after the act of the legislature authorizing the city to issue them ; and that the conditions upon which the bonds were to be delivered had been complied with.

A statute in force at the time of the passage of the resolution empowering the city to issue the bonds, provided that " whenever any amendment or alteration of the charter of any corporation [should] be made, if not otherwise specially provided in the resolve making such alteration or amendment, the same [should] not become operative, unless, within six

months after the passage thereof, it [should] be accepted at a meeting of said corporation legally warned for that purpose."

Sundry other facts, important in the case, are sufficiently stated in the opinion of the court. The superior court rendered judgment for the plaintiffs, and the defendants moved for a new trial. The exceptions taken by the defendants and upon which the motion for a new trial was founded, will sufficiently appear from the briefs of their counsel, and from the opinion of the court.

*R. P. Spalding*, of Ohio, and *T. C. Perkins*, with whom was *G. W. Goddard*, in support of the motion.

1. The bonds were not negotiable, and should have been sued in the name of the payee. 1 Chitty Pl., 4, *note* 1. Id., 5, *note* 3. *Smith* v. *Inhabitants of Cheshire*, 13 Gray, 318. The statute of 1857, (Acts 1857, p. 5,) which provides that the holders of railroad bonds may bring actions on them in their own names, implies that the law was otherwise before, and that it is still so as to all bonds but those of railroad companies. There is no practice in this state authorizing suits to be so brought. The statute which makes certain paper negotiable, speaks only of promissory notes. Rev. Stat., tit. 37, § 1.

2. The bonds were not issued in conformity to the act of the legislature authorizing the city to issue bonds. An authority thus conferred must be strictly pursued, and appear to be so upon the face of the proceedings. *Rex* v. *Croke*, Cowper, 26. *Kirk* v. *Nowill*, 1 T. R., 124. Willcock on Municip. Corp., 26. *New York Firemen's Ins. Co.* v. *Ely*, 5 Conn., 560. *Commonwealth* v. *Erie and Northeast R. R. Co.*, 27 Penn. S. R., 339. *Mercer County* v. *Pittsburgh and Erie R. R. Co.*, id., 390. *Oebrick* v. *City of Pittsburgh*, Pittsburgh Legal Journal, No. 45. *Atlantic and Ohio R. R. Co.* v. *Sullivant*, 5 Ohio S. R., 276. *Pearce* v. *Madison and Indianapolis R. R. Co.*, 21 Howard, 441. The resolve of the General Assembly authorizes, on certain conditions, " certificates of debt " to be issued by the Mayor, Aldermen, &c., of New London, and the same to be delivered to " the New London, Willimantic and Springfield Railroad Company," to aid in the construction and completion of its railroad. 3 Private Acts,

434. This company was a corporation created by the General Assembly at the same session. 4 id., 990. On the 14th April, 1852, the freemen of New London voted that certificates of debt be made and delivered to the " New London, Willimantic and Palmer Railroad Corporation," to aid in the completion of its road. This was a corporate body created by the legislatures of Massachusetts and Connecticut, by distinct legislation in each state. That of Connecticut was had at the May session, 1848. 4 Private Acts, 996. It was made up of the New London, Willimantic and Springfield Railroad Company, chartered in 1847, and the New London, Willimantic and Palmer Railroad Company, chartered by the General Assembly of Massachusetts in 1848. This new company had a capital stock equal in amount to the joint capital stock of both corporations. It received a new name and sundry new privileges ; among them, the right to connect with the track of the Norwich and Worcester Railroad Company. It was required that one or more of its officers should reside in each of the states of Massachusetts and Connecticut, as it was to be constructed over the territory of both those states. The certificates of indebtedness actually issued by the city of New London, and which form the subject matter of this controversy, were in fact made payable to the New London, Willimantic and Palmer Railroad Company. This last was a corporate body, created solely by the legislature of Massachusetts, and with powers confined to that commonwealth. And yet, with all these facts before him, the learned judge who held the superior court, found that the corporate body named in the resolve was substantially the same with that to which the bonds were issued. So far from this, they were necessarily different. *Mc Cray* v. *Junction R. R. Co.*, 9 Ind., 358.

3. The court erred in ruling that evidence was admissible of the vote of the freemen of New London, on the 14th day of April, 1852, as a warrant for issuing the certificates of indebtedness, after proof had been exhibited of the action of the city on the 2d day of March, 1850. In other words the election exercised by the city on the 2d of March, 1850, exhausted the power given to the city by the resolve of 1847. The subsequent votes of March 12th, 1850, March 10th, 1852, and

April 14th, 1852, were " *ultra vires,*" and of no effect.    The enabling act of May, 1847, empowered the mayor, aldermen, common councilmen and freemen of the city to issue certificates of debt to such an amount, not exceeding $100,000, " as should thereafter be determined, by a meeting of said city warned and held for the purpose, by a vote of two-thirds of the electors present and voting on said question."    No day was fixed in the resolve for the election ; but it became fixed when the meeting was " warned " for the 2d day of March, 1850.    No time was limited within which the power should be executed ; but the discretion of the mayor, aldermen, etc., of the city limited the time to the 2d of March, 1850.    " An enabling act gives to a corporation (says Ch. Justice Marshall) all the power they possess; it enables them to contract, and when it prescribes to them a mode of contracting, they must observe that mode, or the instrument no more creates a con_ tract than if the body had never been incorporated."    *Head* v. *Providence Ins. Co.*, 2 Cranch., 127.    Where, in an act incorporating a city railroad, it was provided that the consent of the city council to occupy the streets should be first obtained, and the city council by ordinance declared their disapproval of the act, and declined to allow the streets to be so used, it was held that the power delegated by the legislature was exhausted and that no subsequent ordinance of the city council consenting to the use of the streets could revive the privilege.    *Musser* v. *The Fairmount and Arch Street Railway Company*, Supreme court of Pennsylvania, 7 Am. Law Register, 284.    In the *Averill Ore Bed Case*, a report of which is contained in the Albany Evening Journal of Sept. 2d, 1859, the facts were, that an act of the legislature of New York, passed April 14th, 1855, authorized the commissioners of the land office to purchase certain lands, " if in their judgment it was deemed for the interest of the state," upon certain conditions mentioned in the act.    In August, 1855, a majority of the commissioners then in office examined the lands.    No formal vote was taken and their determination was not made matter of record ; but all the members of the board concurred in expressing their disapproval of the proposed purchase.    On the 1st day of January, 1856, a new board of commissioners

succeeded to the old one. On the 10th of April, 1856, the new board·passed a resolution, which was entered on their minutes, accepting the offer of the owners of the land, and concluding a purchase for the state at the price of $100,000. The contract was reduced to writing and subsequently deeds were executed. The officers of the state were in possession and executed acts of ownership over the property. Upon an application by the vendors for an alternative mandamus to compel the comptroller to pay the first installment of the purchase money, the supreme court held that the contract was not a legal one. The court say: " The act prescribed the time when payment should be made in case of purchase. By providing that the first moiety should be paid on the first day of October, 1855, the legislature evidently intended that the commissioners of the land office, then in office, should determine whether the purchase would be for the interest of the state. The presumption is that they did not deem it for the interest of the state, because we have no right to presume an abuse or neglect of duty. Their successors undertook to exercise this spent authority. In doing so, they arrogated to themselves a power which they did not possess, and violated the plain intent and spirit of the act." *New York Firemen's Ins. Co.* v. *Lawrence*, 14 Johns., 55. 2 Bac. Ab. *Election* D. 1 Jarman on Wills, 385.

4. The power of the city to loan its credit to the railroad, under the resolve of 1847, was spent by lapse of time. The charter limited the completion of the road to a period of four years. It is unreasonable to say that the legislature contemplated in the resolve of 1847, a continuing power in the city to burthen its tax-payers in aid of this construction, for the full term of five years. It is true that the time for completing the road was extended more than once, but this was not contemplated when the resolve was passed.

5. The action of the 14th of April, 1852, was rendered void by coupling conditions with the vote unknown to the resolve of the legislature. To the object for which the bonds were originally to have been issued, was added that of aiding the railroad company in forming a connection with the Norwich and Worcester railroad, in Norwich, and with the New

Haven and New London railroad, in the city of New London; and the following condition was embraced in the vote:—"And further, this grant or vote is upon the express condition that said New London, Willimantic and Palmer Railroad Company shall make or cause to be made a connection between this road and the Norwich and Worcester Railroad Company at Norwich, and between their road and the New Haven and New London Railroad Company at New London." The two-thirds vote was therefore not an acceptance of the proposal as submitted by the legislature to their election, and no valid bonds could be issued upon it. *Mercer County* v. *Pittsburgh and Erie R. R. Co.*, 27 Penn. S. R., 403. *Musser* v. *Fairmount and Arch Street Railway Co.*, 7 Am. Law Reg., 288. On the 2nd March, 1850, 12th March, 1850, and 10th March, 1852, the vote had been taken on the naked proposition embraced in the resolve, and each time rejected by an increased vote.

6. Under the statute (Rev. Stat., tit. 3, § 165,) it was necessary for the city to accept the power conferred upon it within six months after the passage of the resolve by the legislature. That act requires that every alteration of the charter of a corporation, where not otherwise provided, shall be accepted by the corporation within six months, or the corporation shall lose the benefit of it. The resolve in question, conferring upon the city the power to issue bonds, was of course an amendment of its charter, and as no time was prescribed by the act, it required an acceptance within the time prescribed by the general statute.

7. The court erred in overruling the defendant's objection to the introduction of the confirming act passed by the legislature in 1854, with the application of the railroad company therefor. 4 Private Acts, 988. It is sufficient to say that this enactment does not pretend to affect any action of the municipal corporation of New London. It only proposes to heal the numerous delinquencies of the two railroad corporations that unitedly form the New London, Willimantic and Palmer railroad corporation.

8. The court erred in admitting evidence to show that the

city of New London and its inhabitants had, by acts of omission and commission, recognized and confirmed the validity of the bonds, however much they might have been tainted with infirmity in their inception. "A confirmation of a void thing avails nothing." Comyn. Dig., "*Confirmation*," D. 1. "A confirmation shall not have relation to the. prejudice of another." Ibid. D., 4. "A confirmation is itself equivalent to a contract; therefore he who has no capacity to contract, can have no capacity to confirm." Lowrie, J., in *Mercer County* v. *Pittsburgh and Erie R. R. Co.*, 27 Penn. S. R., 409. "The intention of a corporation can be ascertained only by the language of its recorded acts, and neither the private views nor the public declarations of individual members of such corporation are for this purpose to be inquired after." *Bartlett* v. *Kinsley*, 15 Conn., 334. *Fletcher* v. *Peck*, 6 Cranch, 87. *Tolland* v. *Commissioners of Berkshire*, 13 Gray, 12.

9. This defense, if good against the original payee of the bonds, is good also against the indorsee or assignee. *Cummings* v. *Mead*, 6 Am. Law Reg., 56. *James* v. *Cincinnati, Hamilton and Dayton R. R. Co.*, id., 718, 727, 733. *Knox Co. Commissioners* v. *Aspinwall*, 21 How., 539. *Aspinwall* v. *Commissioners of Daviess County*, 22 id., 364. *Bangor Boom Corporation* v. *Whiting*, 29 Maine, 123. *New London* v. *Brainard*, 22 Conn., 552. *Pearce* v. *Madison & Indianapolis R. R. Co.*, 21 How., 443, 4. Clearly the holder is affected by notice of the facts that appear on the face of the instrument.

*Goodman* and *Hubbard*, contra.

1. The suit was properly brought by the plaintiffs in their own names. Bonds of this character have been uniformly treated, in this and other states, as negotiable. The object for which they are issued would be defeated if they were not so, as they could not be sold in the market. Edwards on Bills, 60. *Knox Co. Commissioners* v. *Aspinwall*, 21 How., 539. *White* v. *Vermont and Mass. R. R. Co.*, id. 576. *Craig* v. *City of Vicksburgh*, 3⅘ Miss., 216. *Delafield* v. *State of Illi-*

*nois,* 2 Hill, 160. *Mechanics Bank* v. *New York and New Haven R. R. Co.,* 3 Kernan, 625. *Morris Canal and Banking Co.,* v. *Fisher,* 1 Stock. Cha., 667. *Clapp* v. *Cedar County,* 5 Iowa, 48. *State* v. *Van Horne,* 7 Ohio S. R., 327. *Carr* v. *Lefevre,* 27 Penn. S. R., 413. *Phila. and Sunbury R. R. Co.,* v. *Lewis,* 33 id., 38. *McMasters* v. *Reed's Exrs.,* 1 Grant, (Penn.,) 47. *Gorgier* v. *Mieville,* 3 Barn. & Cress., 45. *Rose* v. *City of Bridgeport,* 17 Conn., 243. *Crosby* v. *New London &c., R. R. Co.* 26 id., 121. Redfield on Railways, § 239. 1 Parsons on Cont., 240. If the bonds are negotiable, then as the plaintiffs are holders for value with no notice of the infirmity of the bonds, they are not affected by it if it exists.

2. The statute requiring an acceptance by a corporation, within six months after their enactment, of amendments of its charter, has no application to the case. The resolve of the legislature in this case was not an amendment of the city charter. But conceding it to be such, yet the statute was not intended to apply to municipal corporations. It was clearly intended to apply only to private corporations, and to those whose charters were not open to amendment without their consent. Further, the acceptance is by the statute to be within six months, only when not otherwise specially provided. Here it is otherwise provided. The resolve contains a proviso that it shall not take effect *until accepted by a vote of two-thirds.* Here is a special provision as to the acceptance, which supersedes that provided by the statute. But, if the statute is applicable to the case, then the difficulty is healed by the act of 1855, which validates all amendments of charters where not accepted in season, if accepted afterwards. Acts of 1855, p. 200.

3. The city had not exhausted its power to act upon the subject of issuing the bonds, by its action at the meetings previous to that at which it was voted to issue the bonds. The act conferring the power upon the city does not limit its action to a single meeting. Nor is any time limited within which the city should act. It was authorized to issue the bonds *whenever* the citizens, by a two-thirds vote, should de-

clare their desire that they should be issued. The act of the city was not to determine the rights of other parties. It was an act upon itself. In the case of *Musser* v. *Fairmount and Arch St. Railway Co.*, cited on the other side, the act of the legislature was to take effect, unless disapproved within thirty days by the city council. The city council, within the thirty days, passed a vote disapproving it. The court properly held this vote to be final, and that a later vote of the council, approving it, was of no effect. That case is entirely different from the present one.

4. It is claimed that the bonds were not issued to the same party that the act of the legislature had directed. But the court below has settled this question by finding that the railroad company in whose favor the bonds were issued, was substantially the same as that mentioned in the act. This is enough. The question is one of substantial, not of technical identity.

5. It is further claimed that the bonds were not lawfully issued, because issued for a purpose not provided for in the resolve; that while the city was authorized to issue the bonds only for the purpose of aiding in the construction and completion of the road, it issued them for the further purpose of aiding the road in making certain connections with other railroads. But this was an important part of the completion of the road. Besides, these connections were authorized by the charter, so that they were properly a part of the construction of the road.

6. But if there were any irregularities in the proceedings of the city, they are healed by the confirming act of 1854. 4 Private Acts, 988. This act, although more expressly validating the acts of the railroad companies named in it, yet by fair implication validates these acts of the city, as being done for the benefit of the railroad company.

7. But if this act does not validate the proceedings of the city, and there have been such irregularities in those proceedings as to affect their legality, then we say that, as the bonds are negotiable, and the plaintiffs are holders for value with no notice of the infirmity of the bonds, they are not affected by such infirmity if it exists. *Wookey* v. *Pole*, 4 Barn. &

Society for Savings *v.* City of New London.

Ald., 1. *Lang* v. *Smith,* 7 Bing., 289. *Stoney* v. *Am. Life Ins. Co.,* 11 Paige, 635. *Bank of Genessee* v. *Patchin Bank,* 3 Kernan, 309. *Frost* v. *Saratoga Mutual Ins. Co.,* 5 Denio, 154. *Alleghany City* v. *McClurkan,* 14 Penn. S. R., 83 *Maddox* v. *Graham,* 7 Am. Law Reg., 769. *Mills* v. *Gleason,* 8 id., 693. *Selling* v. *City of Racine,* id., 603. See also authorities before cited.

. 8. The city of New London is estopped from setting up this defense. The bonds were issued upon a two-thirds vote, as required by the act of the legislature. The certificate of the action of the city was lodged with the secretary of the state. The bonds were offered in the market, and were publicly sold in the city of New London, at auction. They were advertised in the city papers, and the bids were published in the same papers. The city had taken and still holds a mortgage from the railroad company to secure them. The citizens knew that many of the bonds were deposited by the purchasers with the treasurer of the state, as banking securities. The interest coupons were semi-annually paid, by the city treasurer, from the issuing of the bonds until recently, and the payments reported to the city in his annual reports. All this was well known to the citizens, and they might at any time have applied for an injunction to prevent the issuing of the bonds, or the payment of the coupons, or they might have given public notice of the supposed invalidity of the bonds. They stood by and saw innocent purchasers invest their money in them, and it is now too late for the city, or for individual tax payers, to avail themselves of the irregularity of the proceedings of the city, as a defense against the bonds in the hands of parties who have thus been induced to purchase them. *Tash* v. *Adams,* 10 Cush., 252. *State* v. *Van Horne,* 7 Ohio S. R., 327. *Graham* v. *Maddox,* 6 Am. Law Reg., 595. *Morris Canal and Banking Co.,* v. *Fisher,* 1 Stock. Cha., 667. *Davidson* v. *Bridgeport,* 8 Conn., 472.

ELLSWORTH, J. The legislature of this state, by a resolution passed in 1847, empowered the city of New London to issue scrip or certificates of debt, to an amount not exceeding

$100,000, to aid in the construction and completion of the road of the New London, Willimantic and Springfield Railroad Company, a corporation chartered at the same session of the legislature. To this resolution was appended a proviso, that the power so given should not take effect until the resolution was approved by a two-thirds vote of the citizens, and a copy of their doings lodged in the office of the secretary of the state.

On the 14th day of April, 1852, a meeting of the citizens was duly warned and held, and a vote passed approving of said resolution ; a copy of which proceedings was lodged in the office of the secretary of the state. At the same meeting, the city voted that scrip or certificates of debt might be issued, to an amount not exceeding $100,000, in such form as the mayor should think proper. In July following, the city directed bonds to be issued to the amount of $75,000, upon certain conditions which were afterwards fulfilled. The certificates or bonds were accordingly issued, in the name and under the seal of the city, by the mayor and treasurer, and immediately delivered to the New London, Willimantic and Palmer Railroad Corporation, to aid in the construction and completion of the road mentioned in the resolution.

These bonds soon passed into the hands of *bona fide* holders, at something more than their par value. Some were taken by individuals, and some by the banks of this state. Those taken by the banks, at least some of them, were, during the existence of the general banking law, deposited by the banks with the treasurer of the state, as a basis and security for their circulation, in pursuance of the statute of the state. For several years the bank commissioners reported these bonds to the legislature as so held, which reports were approved, and regularly published in the newspapers in New London and Hartford. The most unreserved publicity was given to all these proceedings, and no objection was ever made by any of the citizens of New London. Further, for several years the city of New London continued to pay the coupons attached to the bonds, and these payments regularly appeared in the city treasurer's annual reports.

Now, if this be all there is in the case, it is most obvious that the city can make no valid defense to the suit. We propose to show, in effect, that this is so, certainly as to *bona fide* holders of the bonds, whether we examine the case upon principles of natural justice, or of law and equity.

If the resolution of 1847 had not contained a proviso requiring the consent of the city before the authority given should take effect, the resolution would have been in force at once, as an addition to the existing charter of the city, it being a municipal corporation. And hence, if the conditions of the proviso were fulfilled by the facts herein before recited, as they certainly were if there be nothing more in the case, the authority was perfected on the 14th day of April, 1852, the day when the city decided to make the loan of $100,000. It has been said, I know, that this acceptance of the resolution was too long delayed, but the court below has found that the acceptance was within a suitable time, and that under the circumstances the delay was reasonable and proper.

Whether lodging a copy of the acceptance with the secretary, in case of *affirmative* action, (for it otherwise was not necessary,) was required in order that the government might know that the city had complied with the resolution, or for some other purpose, we need not inquire; it is certain that the plaintiffs had a right to resort to the secretary's office to learn what the city had done in making the loan; and it may be presumed that they cautiously exercised that right, and conducted in their purchase accordingly; for the bonds contain a reference, on their face, to that vote, as the authority under which they were issued.

What, then, are the objections made to these bonds? That as to time we have answered already; and were we at liberty to examine that question *de novo*, we see not why the action of the city might not legally have been delayed as was done. The time obviously was necessarily left to their judgment; the legislature intended that it should be so, we think, by leaving it undefined and general. The city were to have *security* before they made the loan; but in 1847 the railroad company was scarcely organized; the road had not even been

surveyed or established; nor, so far as appears from the papers, had any thing been done to satisfy the citizens that the enterprise would be commenced, or, if commenced, that it would be completed; or, if so, that it would result to their benefit, so as to make it worth their while to render the aid expected.

Again: it is said that the citizens at first, and on two other occasions, signified their pleasure *not* to accept the grant, by voting in the negative, and that this objection is entirely fatal. We think it is not so. The argument is, that the refusal at first *exhausted* the power to approve, and that this power was, thereafter, wholly extinct. The first answer we make to this is, that the city of New London can not, with propriety, make this objection. The bond holders had no knowledge of this refusal, nor were they obliged to know of it. They found *a vote of approval*, passed as the resolution required, lodged in the office of the secretary of the state. They might, we think, well rely on this evidence as full authority for the bonds, and were not obliged to search further in the secretary's office for what the law did not require to be there, a certificate of the *refusal* of the city to issue the bonds, nor were they obliged to search the records of the city of New London to see if there had been any prior action there; and it is not pretended they had any knowledge in fact of such a negative vote.

Applying then to the case the settled doctrines of principal and agent, or the rules of law applicable to negotiable paper, there seems to be no force in this objection.

The city had *apparently*, and *really*, complied with all the requisites prescribed in the resolution; and it may not now urge secret and collateral objections against these bonds, when there was not at the time a single circumstance calculated to excite doubt or suspicion. Could the maker of a negotiable note under like circumstances set up such a defense? We think not, and we do not see why the city of New London, or, if we look beyond the city to the citizens personally, why they should not be governed by the same rule of law.

The proceedings of the city in issuing the bonds were well

known to all the citizens. We must consider them as conversant with the votes of April 14th and July 31st, and everything that was done under the votes; the issuing the bonds in the name of the city; the delivery of them to the New London, Willimantic and Palmer Railroad Corporation for their use; the advertisement of them in the public papers; and the fact that they were bought by honest purchasers, from time to time, for the ultimate benefit of the citizens themselves. They knew, too, that the bonds were taken by the treasurer of the state as security for the issues of bank paper. If all this was without authority, why, we ask, did not the citizens *then* make their objections? Why did they not enjoin the city agents from further proceedings? At least why did they not give *notice* to the public, and put purchasers on their guard, when they knew that a grievous loss must ensue if the bonds were unauthorized. We must believe that, after such acquiescence, it would be an outrage upon morality and justice, and an impeachment of the integrity of the citizens of New London, to allow the city to repudiate its obligations for such a cause. Many of the citizens, we well know, disapprove of and condemn such a repudiation, and we trust all of them would do so were it a simple transaction between man and man, where the culpability could not be thrown off upon a municipal corporation. But it is this very circumstance which enhances the impropriety of the act of repudiation, for the integrity of a public body is its principal virtue. To violate or impair this, is to undermine government itself, and to destroy the very institutions of the civil state. Such repudiation can not receive the countenance of this court of justice. Hitherto repudiation has not any where been countenanced among us, and we trust it would not have received favor in this instance with any of the citizens of New London, had they carefully considered the consequences of the act, and the precedent they were establishing for other and less favored communities. The general doctrine of equitable estoppel, especially as to tax-payers, is most ably discussed and approved in the cases of *The State* v. *Van Horne*, 7 Ohio S. R., 327, *Knox County Commissioners* v. *Aspinwall*, 21 Howard, 539,

*Tash* v. *Adams*, 10 Cush., 252, *Graham* v. *Maddox*, 6 Am. Law Reg., 595, 618, and *Gould* v. *Venice*, 29 Barb., 442.

Perhaps no one thing has done more to disparage the fair fame of our country abroad, or to impair the integrity of our institutions at home, than the loose sentiments which prevail in some parts of the land, as to public and corporate indebtedness. It seems to be thought by some people, that as to obligations of this character, nothing more is called for from the debtor than what is agreeable, easy and convenient. Honor, honesty and punctuality are thought to be quite foreign to the subject. But this is a very great mistake, false and ruinous in the extreme. These virtues are as essential to public bodies as to individuals; and the nation, state, city or municipality that does not observe and cherish them, has upon it a blight which will, in the end, destroy its best interests.

It was said on the argument, that, however proper it might be to compel the city of New London to fulfil her engagements, if the city, as such, was alone affected, yet that individual citizens, *tax-payers*, have rights of their own, which they may defend in the name of the corporate body. But we can recognize no such independent character in the citizen. Besides, the city alone appears here to defend. And if the individual citizens were to be considered as appearing for themselves, they could only defend in the name and according to the rights of the city.

As we have already said, if we may look through the body to notice the individuals as distinct from the corporation, we must notice them as individuals throughout the proceedings upon which we have been commenting, and then we see them sitting with folded hands, silently countenancing the usurpation and fraud of which they are now complaining.

We have hitherto proceeded upon the idea that the case is one of *election*, an election at the *first* meeting of the city, as if it were the case of private property, or an election under an instrument conferring title; and have based our remarks upon the *inadmissibility* of such a defense in a suit by *bona fide* bondholders. But we are not satisfied that this is a case of that character. In view of the object of the city in getting

power to loan its credit, and the language used in the resolution granting it, we think it is not. We think it is rather the case of *municipal power*, to be exercised *whenever* two-thirds of the voters of the city give their assent that it may be done.

Let it be remembered that the power was given to the city at the same session at which the New London, Willimantic and Springfield Railroad Company was incorporated. At that time the enterprise had assumed no practical form; nothing had been done; and whether any thing would be done, or whether *security* could be furnished by the railroad company as required by the resolution, or at what time the loan would be called for, were wholly undetermined and uncertain. Of course *time* and *circumstances* entered most essentially into the character of the grant. We believe the legislature might well have expected that the city would proceed to act upon the subject at *any time* whenever two-thirds of the citizens should think it expedient. It might have been found necessary, as it doubtless was, at the early meetings of the citizens, to postpone action, and hence to adjourn for a time, or indefinitely, or, which is the same thing substantially, do nothing at present; *which latter course was in effect adopted.* But however this may be, the *language* in the proviso seems to be decisive of the meaning of the legislature; it is "until"—that is, *whenever, as soon as*—two-thirds of the voters give their approval. This construction of the resolution is not forced or unnatural, and therefore we prefer to adopt it, as best comporting with the justice of the case, and most in harmony with the views of the citizens of New London until after the situation and interests of parties had become fixed. The case of *Musser* v. *Fairmount and Arch St. Railway Company,* 7 Am. Law Reg., 284, we do not consider to be applicable to this case. There, the court decided that an election was to be made within a definite period; and, considering the *subject matter* of the election and the *language* of the grant, we can not say that they were wrong in the construction which they put upon that grant. They were of opinion that it required immediate action; but that is not the case before us.

It is further said, that the resolution of 1847 authorized the

issuing of scrip or certificates to the New London, Willimantic and *Springfield* Railroad Company, whereas these were issued to the New London, Willimantic and *Palmer* Railroad Corporation. The resolution does not say to whom they shall be issued, but only to whom they shall be *delivered*. This is very express; while the *form* of the certificate is left to the city, who have directed these bonds to be issued and delivered to the New London, Willimantic and Palmer Railroad Corporation. These corporations are found by the Superior Court to be one and the same, and that the latter road is the same as that for which the certificates were originally to be issued. It is said that this can not be true, because it involves a legal impossibility. We think otherwise. They *may* be one. Such a contingency was originally anticipated, and provision made for it, in the charter of the New London, Willimantic and Springfield Railroad Company. When finally the modification or union of the companies took place, the name and existence of the New London, Willimantic and Springfield Railroad Company were given to and confirmed in the combined company, and *all* the franchises, rights and property of the former were transferred to and became vested in the latter; so that the bonds were deliverable to them of right.

Again it is said, that the action should have been brought in the name of the New London, Willimantic and Palmer Railroad Corporation, payees in the bonds. But the bonds are made payable to *bearer*, and are legally negotiable. It is quite too late, after the accumulated decisions in our books, of the highest authority, to urge this common-law objection as to such bonds. The bonds, as we say, were made payable to bearer that they might be delivered to the New London, Willimantic and Palmer Railroad Corporation to be sold. They were of course to be put into the market, and their value depended very much upon their being negotiable like a note. Without it they would scarcely have been marketable or valuable. It is true that, in most cases, railroad bonds are expressly authorized in the charters of the companies to be sold and transferred, but when this is not expressly declared it is given by implication; so that bonds of this character are, at

the present time, held to be negotiable, as much as bills of exchange. The old maxim that a chose in action can not be assigned in law, has long since been exploded as to railroad bonds. We refer only to a few cases in support of the proposition. Edwards on Bills, 60. *Knox County Commissioners* v. *Aspinwall*, 21 Howard, 539. *Craig* v. *Vicksburg*, 31 Miss., 216. *Carr* v. *Lefevre*, 27 Penn. S. R., 413.

The statute passed in 1845 is not, in our opinion, applicable to this case. Probably it does not embrace municipal corporations at all. Besides, the resolution of 1847 is excluded by the exceptions in the act of 1845.

We do not advise a new trial.

In this opinion the other judges concurred; except SANFORD, J., who being disqualified by interest, did not sit.

New trial not advised.