## Case No. 18,002.

### WOODWARD v. CALHOUN COUNTY.

[2 Cent. Law J. 396.] [1]

District Court, N. D. Mississippi. Dec. Term, 1874.

COUNTY BONDS — VALIDITY — AIDING RAILROAD CONSTRUCTION—CONSENT OF ELECTORS—SECOND ELECTION — CONSTITUTIONAL PROVISION— NEGOTIABILITY OF BONDS.

1. It is now too well settled to be controverted, that the legislature may authorize a county or other municipal corporation to aid in the building of a railway in which the inhabitants are interested; and that such authority may be given with or without the assent of the qualified electors of such municipality, unless there be some provision in the constitution denying or limiting this power.

2. The legislature of Mississippi authorized the board of police of Calhoun county to subscribe for stock in a railway company, provided, that there should be an election first held in that county, at which the question should be submitted to the qualified electors. And the act provides that, in case said election should result favorably, the subscription should be made; and in case a majority of the votes be cast against the subscription, the same shall not be made. Under the act, an election was held in 1860, and a majority voted against subscription. In 1869, the board of police again submitted the question to the voters; and at that election, a majority voted for subscription. Held, that the first election did not exhaust the power of the board to subscribe; that the manifest meaning of the act was to authorize the subscription on an approving vote whenever it should be had; that the voters of the county, in this matter, like individuals in making similar contracts, were not bound finally by a rejection of the proposition; that circumstances might change so as to justify a change in their action; and that in acting on a proposition to subscribe, the voters might deliberate, reject at one time, and accept at another. Citing Society for Savings v. New London, 29 Conn. 174; Smith v. Clark Co. [54 Mo. 58]; Woods v. Lawrence Co., 1 Black [66 U. S.] 386.

3. Nor did it affect the validity of the second election, that by the constitution in force in 1860, only whites were allowed to vote, and that when the last election was held freedmen were legal voters.

4. Nor is it any objection to such second election, that nine years had passed since the power to hold it was granted. Whatever might have been the effect in times of peace, the civil war which ensued soon after the power was granted, and the consequent disorganization of business, etc., in the state, justified the delay.

5. The act authorizing Calhoun county to subscribe for stock in the railroad company was passed in 1860; an election was held in October, 1869, at which a majority of the voters assented to the subscription. The new constitution of the state, which prohibits the legislature from authorizing cities, counties, and towns from giving such aid unless upon assent of two-thirds of the qualified voters, was ratified by a popular

1 [Reprinted by permission.]

vote under the reconstruction laws of congress, on the 1st of December, 1869, and the subscription of the stock for the county was actually made on the books of the railway company, on the 1st of January, 1870; and the state was admitted to representation in congress on the 17th of February, 1870. *Held*, that the new constitution did not apply, because, (1) it did not abrogate prior authorities already granted by the legislature, but only prohibited the granting of such authority thereafter; (2) because the new constitution had not on the 1st of January, 1870, taken effect, as to that clause of it which prohibits the granting of such authorities except on terms prescribed. Citing Cass v. Dillon, 2 Ohio St. 607; State v. Union Tp., 8 Ohio St. 394; State v. Sullivan Co., 51 Mo. 531; Kansas City, St. J. & C. B. R. Co. v. Alderman, 47 Mo. 349; State v. Nodaway Co. Ct., 48 Mo. 339; State v. Macon Co., 41 Mo. 453.

6. The said clause of the constitution in relation to municipal subscriptions, does not apply where a debt has already been created for subscription to a railway company; and the legislature might, after the new constitution went into effect, authorize a county to issue its bonds in payment of such debt, and that without submitting the question to the people.

7. The act of 1871, which authorized the issuance of the bonds to pay the county subscriptions to the railway company, directed that the bonds so issued should be made payable to "the president and directors of the railroad company, and their successors and assigns." The bonds issued were made payable to "the railroad company, or bearer." *Held*, that the power granted was sufficiently pursued, and that the bonds so issued were valid; that it was the intention of the legislature to authorize the issuance of bonds which were negotiable, and which, in the hands of innocent holders, for value, would not come under the operation of the statute which subjects innocent holders to the equities existing between the maker and the payee.

8 When negotiable municipal bonds are issued, payable out of the state, or to bearer, they are unimpeachable in the hands of a bona fide holder for value, if there be a law authorizing their issuance. And if the act giving the authority annexes to its exercise certain conditions, and the bonds on their face recite that these conditions have been complied with, then the municipality, on being sued on the bonds by an innocent holder for value, is estopped to deny the truth of the recital.

At law.

Mr. Mayes and Harris & George, for plaintiff.

H. A. Barr, for defendant.

HILL, District Judge. This is an action of debt brought by the plaintiff [Amos Woodward] against the defendant, to recover the amount due upon 218 coupons, upon certain bonds, issued by said board in payment of a subscription of capital stock in the Grenada, Houston & Eastern Railroad Company, which had been subscribed by said board on behalf of said county, and which coupons it is claimed are held by plaintiff as the bona fide owner thereof. Among other pleas pleaded to said action, are five special pleas, to which plaintiff has filed his demurrer and upon which the questions now for decision arise. These pleas taken together, in substance state: That these bonds and coupons were issued on the 1st of September, 1871, in aid of the said railroad company, under the provisions of an act of the legislature of this state, approved on the 25th of March, 1871, and in payment of a subscription for $100,000 as capital stock, subscribed by said board on behalf of said county on the 1st of January, 1870, under the authority of an election, held by the voters of said county on the 25th of October, 1869, in pursuance of an order made by the board of police of said county, on the 22d of September, 1869, and under which order said election is claimed to have been authorized by an act of the legislature of this state, approved the 10th of February, 1860. That on the 1st Monday in August, 1860, the proposition to subscribe for said capital stock, was submitted to the qualified voters of said county, at an election held in pursuance of the act of 1860, and the order of the board of police of said county, made in pursuance thereof, and was then rejected by a majority of said voters. That said rejection exhausted all authority in said board to submit said proposition to said voters, or to make any subscription of capital stock in said company. That when said act of 1860 was passed, none were intended to vote upon said proposition but white persons, who alone were the qualified voters of said county. That when said vote was taken the enfranchised freedmen had become qualified voters of said county. That before said subscription was made the present constitution was adopted, which prohibits the legislature from authorizing counties to subscribe capital stock in, or give aid to railroad companies, without the assent of two-thirds of the qualified voters of the county; and that the subscription of capital stock and the issuance of the bonds and coupons were made and issued in violation of this provision of the constitution, and void, and conferred no authority therefor. That the act of 1871, authorizing the issuance of bonds and coupons in payment of the capital stock subscribed for in said company, required that they should be made payable to the Grenada, Houston & Eastern Railroad Company, their successors and assigns, but that they were made payable to said company or bearer. That by reason of the said several causes, the subscription for said stock and the issuance of said bonds and coupons were without authority of law, void and not binding on the defendant.

The question to be determined is whether any or all of the facts alleged in these several pleas, and admitted by the demurrer to be true, constitute a valid defence to the action. The question is not now whether it is wise or unwise, just or unjust to compel a citizen or owner of property to become a stockholder in a corporation, and to contribute his means for its support, because a majority of the voters of the county or other municipality have by vote so determined, as it is now well settled that such may be done when authorized by the legislature. The question is, did the legislature in this case

authorize it, and were the bonds, the coupons for the interest on which the suit is brought, issued and put in circulation in pursuance of that authority? The declaration alleges that they were, and the pleas deny it. The pleas admit that there was an act passed in 1860, authorizing the board of police to subscribe for $100,000 of capital stock in the Grenada, Houston & Eastern Railroad Company, upon condition that a majority of the qualified voters of said county, at an election to be held for the purpose, should vote in favor of said subscription, but allege that the election provided for was held and the proposition rejected, which exhausted the power conferred; the demurrer admits the election and the vote adverse to the proposition, but does not admit the effect, that is, the exhaustion of the power; and this is the first question to be determined, as this is the only act of the legislature under which it is claimed the subscription was authorized. This question and indeed all the questions which have been raised, and ably argued by the distinguished counsel on both sides upon these pleadings, are of first impression in this court, and so far as I am informed in any court in this state, are important to the holders of the bonds and coupons issued and first put in circulation, to the tax-payers of Calhoun county, and to those interested in this railroad enterprise, and should be considered with all the care, aided with all the lights attainable, so as to arrive at a correct conclusion as to the rights of the parties.

The legislature might have authorized the subscription without a vote of the citizens, as there was then no constitutional inhibition, but it wisely provided that it should not be done without the assent of a majority of the voters, who should vote in the election to determine the question. That majority was not then obtained, and had the act contained any provisions either in positive terms, or from which it could reasonably be inferred that that vote should be final and conclusive, then any subsequent vote would be without authority. In construing all statutes, the true intent of the legislative mind is the thing to be ascertained, and in the ascertainment of which resort must be had to the purpose of the enactment. the benefits to be secured, and the evils to be prevented. The purpose of this legislation was to give pecuniary aid to the construction and operation of a railroad which was to pass through Calhoun county, which it was supposed would afford facilities to its citizens and develop their resources. The circumstances of the citizens might greatly change in even a short time, their ability to pay depending very much upon the amount of their marketable productions, and their price. Also the necessity of the aid which was sought might be greater at one time than at another; at one time it might have been thought the enterprise could be successful without resorting to this means;

at another it must fail without it. It was authority given to the board of police to make a contract for the taxpayers of the county, provided a majority of the qualified voters assented to it, and, unless restricted like individuals, a proposition might be rejected at one time and accepted at a future time. There is no express provision that the vote taken should be conclusive, and when looking to the purpose of the act, I find nothing in it from which that inference can necessarily be drawn. I am of the opinion that the proper construction to be given to this statute is, that authority was given to the board of police to make the subscription whenever a majority of the qualified voters of the county should assent to it, by the vote of a majority of the qualified voters who should vote on the question at an election to be held, to decide upon the acceptance or rejection of the proposition. This construction is sustained by the numerous adjudicated cases in other states upon like propositions, in some of which the proposition for subscription was made and rejected repeatedly, and then accepted, and its acceptance held binding. See Society for Savings v. New London, 29 Conn. 174; Smith v. Clark Co. [54 Mo. 58]. See, also, Woods v. Lawrence Co., 1 Black [66 U. S.] 386.

Another objection to the validity of this election insisted on by defendant's counsel, is that when the act was passed, none but white persons were qualified voters, and that when the election was held, those formerly slaves, then freedmen, were made voters. The plea does not aver that any of them voted in the election, and as the present constitution by which they were made voters, did not take effect until after that time, I take it that they did not vote. All the votes which they had before that time cast were under the act of congress, and confined to the special elections provided by the act; and were it otherwise, this objection is not maintainable. The act of 1860 evidently intended to embrace all the qualified voters who were such at the time the election was held. The voters constantly change by death and removals, by new accessions, by becoming of lawful age, and by immigrations at all times. And by the addition of the lately enfranchised, under the present constitution, another class was added, but when added, became as much entitled to vote as any who had preceded them. Still another objection urged, is, that more than nine years had elapsed from the passage of the act before the election was held. Whatever force there might have been in this objection, had the war not intervened and the consequent disorganization of civil government ensued, and which continued up to the time, or nearly so, when the election was held. these circumstances must be held sufficient to avoid this objection.

After a careful consideration of all the objections urged against the validity of this elec-

tion, I am of the opinion that none of them are maintainable. And it must be held that the board of police was authorized to make the subscription, unless prevented by some subsequent obstacle, and which it is insisted did intervene by the adoption of the constitution submitted to the vote of the qualified electors of the state in November thereafter, and before the subscription was made, one provision of which inhibits the legislature from authorizing any county, city or town to become a stockholder, or to lend its credit to any company, association or corporation, unless two-thirds of the qualified voters of such county, city or town, at a special or general election to be held therein, shall assent thereto. The subscription was made January 1, 1870, after the election was held by which the constitution was ratified by the electors of the state, but it was nugatory until the state government created by it was authorized by congress, which was not done until after that time, on the 17th of February, 1870. So that it can not be held that this subscription is in any way affected by this provision of the constitution. But I am of opinion that this inhibition, being placed upon the legislature, was intended only to apply to the action of that body afterwards to be had, and not to any authority theretofore given, and for a very good reason. Others upon the faith of this subscription might have been induced to subscribe for stock under the belief that the enterprise would be thus rendered successful. Contracts might have been entered into upon the faith of the subscription; but not so with regard to subscriptions of stock afterwards authorized, which will further appear from the following (the fifteenth) section of the constitution which inhibits the sale of lottery tickets and further inhibits the drawing of any lottery theretofore authorized, or the sale of lottery tickets. This section is self-executing; the fourteenth section is not. If it had been intended to apply to subscriptions before that time authorized, no reason can be perceived why it was not expressed. I am satisfied that this provision can not be made applicable to this subscription; and this conclusion is sustained by a number of adjudications by the supreme courts of our sister states. See on this point, Cass v. Dillon, 2 Ohio St. 609; State v. Union Tp., 8 Ohio St. 398; State v. Sullivan Co. Ct., 51 Mo. 531; Kansas City, St. J. & C. B. R. Co. v. Alderman, 47 Mo. 349; State v. Nodaway Co. Ct., 48 Mo. 339; and State v. Macon Co., 41 Mo. 453. I am, therefore, compelled to the conclusion that no valid objection is shown against this subscription. The next, and not less important question, is, were these bonds and coupons authorized by law to be issued, and are they of binding force upon the defendant as the representative of the taxpayers of Calhoun county? To make them so obligatory they must have been issued by legislative authority. This authority is claimed to have been given by the fourth section of an act passed March 20, 1871, entitled "An act to amend an act entitled 'An act to aid in the construction of the Grenada, Houston and Eastern R. R., approved February 10th, 1860,"' which reads as follows: "That it shall and may be lawful for the board of supervisors of any county which shall have voted a tax as provided by this act or of an act to which this act is amendatory, to issue bonds due and payable at such time or times as said board of supervisors may deem best for the taxpayers of their respective counties, not to extend beyond ten years from the date of their issuance, for such sums as said boards of supervisors may deem necessary to meet, pay off and discharge the subscriptions of said counties, respectively, for capital stock in the Grenada, Houston and Eastern Railroad Company, which have been, or which may hereafter be subscribed by said boards of supervisors, or by the boards of police (as the case may be) respectively, not to exceed the total sum of such stock subscriptions, which said bonds shall be signed by the president of the board of supervisors issuing the same, and be made payable to the president and directors of the Grenada, Houston and Eastern Railroad Company, and their successors and assigns, and may be assigned, sold and conveyed with or without guarantee of payment by the said president and directors, or may be mortgaged in like manner, at their discretion, as they may think best for the company." The defendant's counsel insists that the issuance of these bonds and coupons under this act was a pledging the credit of the county of Calhoun to the company, which, by the provisions of the constitution above stated, could not be made binding upon the tax-payers of the county, unless assented to by a majority of two-thirds of the qualified voters of the county, which, it is admitted, was never procured. This was but a means provided for the payment of an obligation already incurred. The act limits the amount to be issued to a sum sufficient to pay off and discharge this obligation, and unless it changes the amount and time of payment, can work no hardship upon the tax-payers, and the plea does not allege any such change; therefore without further comment or reference to authority, I must hold this objection not well taken.

But it is insisted on behalf of defendant that the bonds and coupons were not issued as directed by this act, in this that they were directed to be made payable to the president and directors of the Grenada, Houston & Eastern Railroad Company, their successors and assigns; whereas, they were made payable to the Grenada, Houston & Eastern Railroad Company, or bearer, and that this departure created them different obligations from those directed and intended, and renders them void and of no binding obligation. So far as the mere name of the payers, or payee of this obligation is concerned, it is

sufficient if substantially the same. It was not intended to vest the president and directors of the company, as individuals, with any interest whatever; they were the mere agents of the corporation; the corporation was intended to be the payee, and such being the case, they could be sold, transferred and assigned as though made payable to the company by its corporate name. For authority to sustain this position, see Maddox v. Graham, 2 Metc. (Ky.) 78, and authorities therein referred to.

It is next insisted that it was the intention of the legislature that these obligations should be governed by what is known as the "anti-commercial statute" of this state, first passed in 1822 and continued in the Codes of 1857 and 1871, by which the holder of the obligations, therein made assignable so as to vest the legal title in the assignee and allow him to sue in his own name, holds the same, subject to the same infirmities and equities as existed against the payee when the assignment was made, and that these bonds being made payable to bearer, made them commercial paper, unimpeachable in the hands of a bona fide holder for value and without notice of such infirmities or equities, and hence different in their effect and binding obligation, and therefore void. This question has never before been presented to me, but questions arising under this anti-commercial statute are not new either to this court or to the supreme court of the state. The act is as follows: "All bonds, obligations, bills single, promissory notes and all other writings for the payment of money, or any other things, shall and may be assigned by endorsement, whether the same shall be made payable to the orders or assigns of the obligee or payee or not; and the assignee or endorser may sue in his own name and maintain any action which the obligee or payee might or could have sued or maintained thereon previous to assignment; and in all actions commenced or sued upon any such assigned bond or obligation, etc., the defendant shall be allowed the benefit of all want of lawful consideration, failure of consideration, payments, discounts and sets-off made or had against the same previous to the notice of the assignment, etc., in the same manner as if the same had been sued and prosecuted by the payee or obligee, and the assignee or endorsee may maintain an action against the person or persons who may have endorsed the same, as in case of inland bills of exchange."

I have, heretofore, decided, in construing this act, that it was intended to embrace such instruments only as were not before that time assignable under the laws in force in this state, so as to vest the holder with the legal title, and authorize suit thereon in the name of the assignee or endorsee, and not such instruments as before that time were negotiable and vested the legal title in the holder, with the right to sue in his own

name, and in justice to the makers of such instruments reserved such equities which they might have before notice of such transfers. The obligations, the transfer of which are authorized, are such as are usually only transferred in the vicinity of their creation, and where it is an easy matter for the party desiring to take the transfer to enquire and ascertain whether there are any equities or off-sets against it. I am satisfied with this construction, and am not aware of a materially different construction having been given by the courts of the state obligatory upon this court. The high court of errors and appeals in the case of Craig v. City of Vicksburg, 2 George, 216; Stokes v. Winslow, Id. 518; Mercien v. Cotton, 5 George, 64; and Winstead v. Davis, 40 Miss. 785,— hold that bills, bonds and promissory notes payable to bearer, were negotiable at common law and not within the statute. So is a note made payable to the order of the maker, and endorsed in blank, not embraced within this anti-commercial provision. So is a note or other obligation made payable within another state, not so embraced, but is governed by the laws of the state where payment is to be made. As a general rule obligations made for the purpose of being thrown upon the market and becoming a portion of the circulating medium of the country in commercial transactions, are usually held as unimpeachable commercial obligations. These rules, I am satisfied, will be found sustained by the elementary books and adjudicated cases. The purpose of the issuance of these bonds and coupons must be ascertained from an examination of the powers given in the act itself, and the custom of the country with reference to similar obligations issued by other corporations and municipalities. The company was authorized to sell, transfer, assign and mortgage the same as the discretion of the president and directors might deem best for the company, thus giving them an unlimited power of disposition over them to raise money, or to be used in any other way deemed most to the interest of the company.

No restriction is placed upon the board of supervisors as to the time or place of payment, except that all shall be payable within ten years from their issuance. There being no restriction as to the place of payment, no reason is shown why they should not have been made payable in the city of New York, the great money centre of this country. At the time of their issuance, as now, there was but little money in this state for such investment; consequently the bonds, to subserve their purpose, had to be sold where there was a market for them. If these obligations were properly made payable in the city of New York, where commercial law prevails, and where obligations of this character are unimpeachable in the hands of a bona fide holder, then the objection under consideration must fail. Or if to carry out the pur-

pose of their issuance by making them payable to bearer, the same result must follow.

I am satisfied, after a careful consideration of the act authorizing the issuance of these obligations, and the purpose for which they were issued, that no such departure from the provisions of the statute has been made as to invalidate them. Other reasons might be stated, but those given are deemed sufficient. According to the conclusions reached, these obligations could not be impeached if they were now held by the company, or that which has succeeded to the rights of the former company, the payees of these obligations. But being payable in the city of New York, and payable to bearer, they are unimpeachable in the hands of a bona fide holder without notice, the holder being only required to know that there was legal authority for their issuance, the bonds reciting upon their face that all the acts had been substantially performed that the act of the legislature, authorizing their issuance, required. To sustain this position I refer to many decisions made by the supreme court of the United States upon similar obligations, from the case of Commissioners of Knox Co. v. Aspinwall, 21 How. [62 U. S.] 543, up to the present time, embracing one or more cases at every term of that court of last resort in the nation, and binding on this court at least.

Admitting that the objections insisted upon in these pleas were sufficient to have justified the defendant or the tax-payers to have restrained by injunction the board of supervisors from issuing these bonds, or the company from using or transferring them after issued, had it been done in time, yet having acquiesced for so long a time in their issuance and transfer into the hands of bona fide purchasers without notice of any objection, and until after contracts had been made and labor performed, I am inclined to the opinion it is now too late to raise the objection, but upon the other grounds stated, I am satisfied the demurrer to all these special pleas must be sustained, with leave to plead over. Sixty days allowed in which to plead.

NOTE. The act of 1860, is as follows: "The board of police of the several counties, Yallobusha, Calhoun, etc., through which the G. H. & E. R. R. may pass, may, for their respective counties, open (sic) such conditions as they think proper, subscribe for capital stock not to exceed in amount two hundred thousand dollars, for any one county. Provided, however, that an election shall be held in the county for and on account of which stock is proposed to be subscribed by the qualified electors thereof, at the regular precincts of said county, twenty days notice of the time of holding such election, and of the amount proposed to be subscribed, and in what number of installments, being first given by the board of police; and if at said election a majority of the qualified electors voting shall be in favor of such subscription, then said board shall make such subscription for and in behalf of the county, for the amount specified by the president of said board of police, subscribing the amount so specified to the capital stock of said company, but if a majority of those voting shall be opposed to such subscription, the same shall not be made." Section 1.

The clause of the new constitution, referred to, is as follows: "The legislature shall not authorize any county, city, or town, to become a stockholder in, or to lend its credit to any company, association, or corporation, unless two-thirds of the qualified voters of such county, city or town, at a special election, or regular election, to be held therein, shall assent thereto." Section 14, art. 12.

Section 4 of the act of 1871 is as follows: "That it shall and may be lawful for the board of supervisors" (formerly board of police) "of any county which shall have voted a tax as provided by this act, or of the act to which this act is amendatory" (i. e., act of 1860, supra), "to issue bonds due and payable at such time or times as said boards of supervisors may deem best for the tax-payers of their respective counties, not to extend beyond ten years from the date of issuance, for such sums as said boards of supervisors may deem necessary to meet, pay off and discharge the subscriptions of said counties, respectively, for capital stock in the G. H. & E. R. R. Co., which have been or which may hereafter be subscribed by said boards of supervisors, or by the boards of police (as the case may be), respectively, not to exceed the total sum of such stock subscriptions, which said bonds shall be signed by the president of the board of supervisors issuing the same, and be made payable to the president and directors of the G. H. & E. R. R. Co. and their successors and assigns, and may be assigned, sold and conveyed with or without guarantee of payment by the said president and directors, or may be mortgaged in like manner at their discretion, as they may deem best for the company."