JOHN M. DOUGLAS *vs.* THE TOWN OF CHATHAM AND OTHERS.

The constitutional power of the legislature to authorize towns to aid in the construction of railroads is too well established to be called in question.

The town of Chatham voted "to endorse and guarantee to an amount not exceeding $40,000 the second mortgage bonds of the N. H., M. & W. Railroad Company, the bonds to be used in the completion of the road, on and after such time as the road should be graded, a permanent track laid and cars run upon it between *N. H.* and *C.*" Like bonds to double the amount of those guaranteed were to be left with the town as collateral security for its guarantee. Like votes were passed by all the towns on the line of the road. The second mortgage issued by the company had been previously made to the towns to secure bonds issued by them in aid of the railroad; all the towns however had voted to release this mortgage, but it had never been in fact released. The later mortgage given to secure the bonds to be guaranteed by the towns was therefore in fact a third mortgage, but the bonds were known as the "second mortgage bonds," and were in fact the bonds intended by the town of Chatham in its vote. The company had complied with the conditions of the vote, and had delivered to *D* in payment of a debt of $5,700 due him for materials furnished for the completion of the road, bonds of three times that amount, with

an order upon the town for its guarantee of one-third of the bonds, the other two-thirds to be retained by the town as security. The town, upon demand, having refused to guarantee the bonds, *D* brought an application for a mandamus to compel the officers of the town to execute a guarantee in the name of the town.   Held—

1. That parol evidence was admissible to show that the bonds in question were the ones known as "second mortgage bonds" and were the bonds intended by the town in its vote.

2. That the expression in the vote, "on and after such time as the road should be graded, &c."—was intended merely to fix the time for the guaranteeing of the bonds by the town, and that they might be issued and used in the completing of the road before that time.

3. That the guaranteeing of $40,000 of the bonds by the town with the taking of the stipulated security, was intended to be one transaction, and that the officers of the town could not be compelled to discharge the duty in parts and upon the separate demands of the holders of fractional amounts.

4. That a mandamus could issue only to compel the officers of the town to discharge their entire duty, by guaranteeing the whole $40,000 of bonds; but that this could not be done in the present case because *D* had not averred in his petition a demand for and refusal of this entire duty, and had prayed only for a mandamus compelling the officers to guarantee the particular bonds held by him.

Where facts are found which are not averred, they are of no avail.

Bonds issued by a town in aid of a railroad are an "investment" in the railroad.

APPLICATION for a mandamus, to compel the respondents to guarantee certain railroad bonds; brought to the Superior Court in Middlesex County.   The petitioner made the application in the name of the state as well as in his own name. The court found the following facts :—

The New Haven, Middletown & Willimantic Railroad Company was incorporated in the year 1867, with power to build a railroad from the city of New Haven to the village of Willimantic in the town of Windham in this state, passing through the town of Chatham.   In the year 1868 the several towns through which the road was to pass, and which were mentioned in the act of incorporation, were authorized by the legislature to loan their credit by the issue of their bonds for the purpose of aiding in the construction of the railroad to an amount not exceeding in the case of each town five per cent. of its grand levy, and to secure these bonds the railroad company was likewise authorized to execute a mortgage of all its property and franchises.   Under the pro-

visions of its charter and these acts of the legislature, the corporation issued its bonds with coupons attached carrying interest at seven per cent. per annum, payable semi-annually; and secured the same by a mortgage of all its property, and franchises, dated May 31st, 1869. And the several towns of New Haven, Middlefield, Middletown, Portland Chatham and Hebron issued, and delivered to the railroad company their bonds with coupons attached bearing interest at the rate of seven per cent. per annum payable semi-annually, to the amount of one million one hundred thousand dollars, and in pursuance of the act the railroad company executed a second mortgage of all its franchises and property, dated June 5th, 1869, to secure the towns from all loss upon the bonds. Of these bonds the town of New Haven issued $500,000; the town of Middlefield $40,000; the town of Middletown $387,-000; the town of Portland $108,000; the town of Hebron $28,000; and the town of Chatham $37,000. The railroad company paid the interest on the bonds down to the 20th of December, 1870; and the interest as it has accrued since that date has been paid by the towns respectively.

In the year 1868, by a resolution of the General Assembly, the town of Middletown was authorized to subscribe for and take stock of the company to an amount not exceeding at par value the sum of $200,000; and in the year 1869, all the towns above named were authorized to subscribe for and take stock of the company upon certain conditions prescribed as to the form of proceeding in the resolution. Subsequently to the passage of the last act the town of Middletown, by vote of September 1st, 1870, took two thousand one hundred shares of the stock and paid therefor at par value $210,000; the town of Portland, by vote of October 10, 1870, took one thousand and eighty shares and paid therefor at par value $108,000; the town of Chatham, by vote of November 10, 1870, took three hundred and fifty shares, and paid therefor at par value $35,000.

Since the organization of the company the direction of its affairs has rested with the several towns lying upon the route of the road, including the town of Chatham; and the town of

Chatham, with the exception of a few weeks in 1873, has always been represented by a director, to wit, Charles A. Buell, a resident of the town, which director was one of a committee to look after the interest of the town in the road, and for two years previous to 1873 was first selectman of the town.

In the year 1871 the railroad company, owing to changes in the character of the structures on the road by the use of iron in place of wood, especially for bridges and viaducts, and owing to other causes, had become embarrassed, and work on the road had ceased for nearly ten months, from about February, 1871 to the December following. In view of these embarrassments, and of the prospect of an abandonment of the enterprise, and to prevent the same if possible, the towns on the route of the road, including the town of Chatham, held various meetings for the purpose of discussing and adopting measures to relieve the road from its embarrassments and to prevent a loss of the interests which they respectively had in the stock, bonds and mortgage security of the road ; and the towns severally appointed in town meetings held for the purpose, committees to confer with each other for the purpose of devising some plan to aid the road and if possible secure its completion.

Meetings were held from time to time by the committees at the office of the company, where the books, assets and liabilities of the company were examined, the estimates of the engineers were discussed, the amount and character of the work to be done was inquired into, and the proposals of the contractors to complete the work considered ; which proposals were subsequently put into the form of contracts in writing, and covered the entire completion of the road. These contracts were of one general form, and all contained a provision that the amount to be paid for the work should be in monthly payments upon an engineer's report as to the work done, and the following provision as to the mode of payment:—" And such payments shall be made in bonds of said company at par, bearing interest at seven per cent. per annum payable semi-annually, and endorsed or guaranteed by some one of the

Douglas *v.* Town of Chatham.

towns on the line of said road which have recently voted to so endorse or guarantee."

It was agreed by the committees that the towns of Middletown, Middlefield, New Haven, Chatham, Portland and Hebron, should call town meetings and vote, upon such terms and conditions as each town might determine, to release such interest as they might have in the mortgage which had been given to secure the towns for the amount of the bonds delivered by them respectively to the company; and that the towns in connection with the railroad company should apply to the General Assembly at its next session to ratify and confirm the action of the towns in respect to the release; and also to procure authority to the railroad company to issue its bonds to the amount of two millions of dollars, and to execute a mortgage of its stock, franchises and property to secure the bonds; and also to procure authority to the towns to guarantee an amount of bonds that should not exceed in the aggregate $700,000; and it was further agreed by the committees that no portion of the guaranteed bonds should be used for the payment of any part of the then existing debts of the company, except for interest which might be required to be paid on its first mortgage bonds.

The several towns, including the town of Chatham, voted to release their interest as aforesaid in the mortgage, pursuant to the plan proposed by the committees, and the votes of all the towns were passed at meetings duly called for the purpose. The vote of the town of Chatham, which was passed May 10th, 1871, was as follows :—

" *Voted*, That the town of Chatham agrees to relinquish its second mortgage securities on the New Haven, Middletown & Willimantic Railroad Company, and all its claim and demands against the New Haven, Middletown & Willimantic Railroad Company which are secured by second mortgage, on condition that the said company issue and deliver to said town of Chatham such a number of shares of fully paid stock as will at par equal the amount of its second mortgage bonds so relinquished, when individuals shall show to the satisfaction of a majority of the agents to be herein named that

they will complete the road ; and upon such other and further conditions as may be determined in writing by Philo Bevin, Horace Johnson, John Carrier, and D. W. Watrous, who are hereby appointed agents of the town of Chatham, with full power and authority to do and perform each and every act they may deem necessary to carry the votes of this meeting into effect.

" *Voted*, That if the town of New Haven shall hereafter, as has been proposed by leading gentlemen of that town, relinquish its second mortgage securities upon the said railroad, and all its claims and demands against the said railroad company which are secured by said second mortgage, in order thereby to aid in the completion of the railroad ; then, and in such case, our said agents are hereby authorized and directed to vary the condition of the foregoing vote, so as to relinquish to said company without demanding stock therefor, a similar percentage on Chatham's grand list, that is to say, so much of this town's claims and demands as amount to one and one-fourth per cent. of this town's grand list at the time said second mortgage was made."

The committee appointed by this vote, in conjunction with other committees appointed by the other towns and in conjunction with the railroad company, applied to the legislature at its session in 1871, and at their request the vote to release the mortgage was ratified and confirmed, and the railroad company was authorized to issue its bonds to the amount of two millions of dollars, and to secure the same by mortgage as aforesaid ; and they likewise procured authority to the towns to guarantee the bonds of the company to the amount before stated.

The conditions prescribed by the votes of the several towns to release the mortgage as aforesaid, have all been complied with, although no release by any of the towns has been in fact executed, the vote of New Haven being to relinquish its interest when the road was completed, and the understanding being that the release was to be executed by all the towns simultaneously.

Immediately after the passage of the acts last mentioned

the railroad company, in conjunction with the town committees, fixed upon the form of the bond to be issued, and the mortgage to secure the same. The mortgage and the bonds were antedated, so as to make the interest thereon payable on days between the days of payment of interest on the first mortgage bond of the company.

It was arranged by the committees that the towns of Middletown, Middlefield, Portland, Chatham, and Hebron should vote to guarantee five hundred thousand dollars of the bonds of the last two million issue, and that the railroad company should deliver to them as collateral security for such guaranty, one million of the same kind of bonds so guaranteed ; and the railroad company assented thereto.

Subsequently to the agreement the town of Middlefield, October 30th, 1871, voted to guarantee $30,000 of the bonds; the town of Middletown, September 23d, 1871, voted to guarantee $300,000; the town of Portland, October 9th, 1871, $102,000; the town of Hebron, September 30th, 1871, $28,000; and the town of Chatham, by vote of October 14th, 1871, voted to guarantee $40,000 of the bonds. The votes of the inhabitants were taken by ballot, and the following is the record of the proceedings of the town of Chatham.

" At a special meeting of the legal voters of the town of Chatham, legally warned and held on the 14th day of October, 1871, the following questions were considered and adopted. First: Will the town of Chatham authorize and direct the selectmen to endorse and guarantee an amount of second mortgage bonds of the New Haven, Middletown & Willimantic Railroad Company, that shall not exceed in amount the sum of Forty Thousand Dollars, said bonds to be used to aid in the completion of said railroad, on and after such time as said road shall have been graded, the track laid permanently, and cars shall have passed over said road from the city of New Haven to the village of East Hampton in said Chatham. Further, will they appoint a financial committee whose duty it shall be to act in behalf of said town, to receive from the selectmen the endorsed or guaranteed second mortgage bonds of the railroad company and

transfer said bonds to said railroad company, and receive in exchange therefor from said company in its second mortgage bonds double the amount of the bonds guaranteed, whenever said New Haven, Middletown & Willimantic Railroad Company by its authorized agents shall have complied with the conditions prescribed by the legal voters of the town of Chatham. Further, will the legal voters of Chatham authorize said financial committee to select one member from their number to act as an agent for the town of Chatham in representing and voting on all stock and bonds now held, or that may hereafter he held, in or against said railroad company, by said Chatham, in each and every meeting of the stockholders of said railroad company.

" *Voted* that Philo Bevin, Horace Johnson, John Carrier, A. H. Conklin, Harrison Brainard, Cyrus Hurd, Charles A. Strong, and Warren Veazey, be appointed a financial committee to carry out the conditions prescribed in the warning for this meeting."

Immediately after these votes were passed, the railroad company, relying upon the same, took the preliminary steps for resuming work on the road. The proposals which had been previously made for the completion of the road by the contractors, and had been conditionally accepted, were accepted absolutely, and contracts in writing which had been previously prepared, in accordance with such proposals, were duly executed by the company and the contractors for the entire completion of the road. Upon the execution of the contracts work was resumed on the road and proceeded simultaneously on all parts of it which were then unfinished between the town of Middletown and the village of Willimantic, as was contemplated in the contracts.

Subsequently, and about the 7th day of December, 1871, the bonds were issued, and a mortgage to secure the same was executed and recorded, as in the resolution of 1871 authorizing the same was provided. The bonds so secured by this mortgage were called " Second Mortgage Bonds," during the consultations of the committees of the towns, and in their interviews with the company, and have ever since been known

by that name and by no other; by this name they were always called and known by the officers of the company, by the town officers of the towns, by the contractors, and by the public generally, and were passed from hand to hand and treated and sold by this name ; and they were so treated and called by the committee of the town of Chatham, at the time of the agreement to vote to guarantee.  Whatever may be the proper name of the bonds, they are the bonds which the town of Chatham by its vote intended to guarantee.

The respondents objected to the introduction of parol testimony, with reference to the question whether these bonds were the bonds understood by the town of Chatham in the votes ; but the court admitted the same.

Subsequently, in the progress of the work, the relator, John M. Douglas, at the request of the company, paid out money in the purchase of railroad ties, which were used in the completion of the road generally, at various times, amounting in the whole to the sum of $5,700, and received therefor from the company its bonds of the issue authorized by the act of June 22, 1871, amounting to the sum of $17,100,—together with the following order upon the town :—

"Middletown, Ct., Dec. 21, 1872.  To the selectmen and the special committee of the town of Chatham.  Gentlemen: Please deliver to the order of John M. Douglas, Five Thousand Seven Hundred Dollars in bonds of the New Haven, Middletown & Willimantic Railroad Company, which are to be guaranteed by the town of Chatham, under your direction, pursuant to the vote of said town, October 14th, 1871, as the same have been assigned to him for materials supplied in completing said railroad.  *New Haven, Middletown & Willimantic R. R. Co.*, by ALLYN M. COLEGROVE, *Treasurer.*"

The said ties were delivered on the road by Douglas in December, 1872, and January, 1873.

The railroad company supposing that they had the right to demand of the town of Chatham the guaranty on the bonds to the extent of $40,000, when the railroad was graded to the village of East Hampton, the track permanently laid thereon, and the cars had run to that place from New Haven, and

also supposing that they had a right under said vote to deliver the bonds to the amount of $17,100 and the order accompanying the same to Douglas, and that he would have the right to demand of the town the guarantee of the bonds to the amount of one-third thereof, not only delivered to him the bonds stated and the foregoing order, but drew and delivered sundry other bonds accompanied by like orders on the town, to the amount in the aggregate of $120,000; all of which was done for work and materials used in the completion of the road, except $13,500 used for land damages in Portland.

Prior to the delivery of the bonds and orders to Douglas, the railroad company had delivered, of the second mortgage bonds, so called, to secure the contractors for work done in completing the road, in five different lots, the sum of $46,500, and likewise therewith five different orders upon the town of Chatham to guarantee one-third of the bonds in favor of the contractors, and to retain the other two-thirds as collateral.

Douglas, on the receipt of the bonds and order and before advancing any money thereon, made an inquiry of Charles A. Buell, then the first selectman and one of the committee of the town of Chatham, as to the probability of the town guaranteeing the bonds and receiving the collaterals, and Buell informed him that he had no doubt that the town would guarantee the bonds whenever the road had been graded and the track permanently laid and cars had run to the village of East Hampton; and upon such assurance Douglas commenced to advance money for the purchase of ties, and notified the town and the selectmen of the town that he held the bonds and order of the company as before stated.

The order so given to Douglas and the notice thereof to the town, were the sixth order and notice of the orders and notices so drawn and given to the town. It was the practice of the railroad company and of the contractors during the time of the execution of the contracts, to notify the town and its selectmen in writing from time to time as the orders were drawn. Buell, as the first selectman of the town and

one of the committee, received notice of the orders and of the delivery of the bonds, and was depended on by the board of selectmen of the town to attend specially to the interests of the town in the road. Charles A. Buell, Cyrus Hurd, and William E. Barton were the selectmen, and from time to time Buell communicated the purport of the orders to the board of selectmen, and also informed the financial committee with regard to the same.

The railroad bed was graded and the rails laid, and the cars carried freight to East Hampton, on or about February 13th, 1873, and freight was regularly carried from and after March 1st, 1873. On the 2d of March, 1873, the president and treasurer of the company met the board of selectmen, and the financial committee of the town, in the village of East Hampton, with one hundred and twenty thousand dollars of the mortgage bonds, and requested the guaranty of forty thousand dollars thereof, and proposed to leave the whole of the bonds with the selectmen or the financial committee, and requested them to signify whether they desired them to leave the bonds in their custody for that purpose; but both the selectmen and the financial committee refused to guarantee or receive the bonds, desiring time to take counsel thereon, and alleging as a reason for delay that they believed the road was not sufficiently ballasted to entitle the company to the guarantee.

This request and tender of the railroad company was made in the name of the company, but for the benefit of the several persons who had received the several orders before mentioned; the bonds not having at that time been delivered to the persons holding the orders therefor, but being held by the company for their benefit.

Soon after the above interview the selectmen reported to the company that they had taken counsel, and that they should require the company to ballast the road more completely, and that when this was done the bonds would be guaranteed. At this time the road was in fact graded, the track was laid as tracks are usually laid on new railroads, and the cars had run thereon according to the conditions of the

vote of the town ; and the company immediately completed the ballasting of the road according to the request of the selectmen and financial committee, and afterwards the company fully completed its road through the whole line thereof and regular trains for passengers and freight ran through from New Haven to East Hampton as early as May 20th, 1873 ; and regular trains have run through to Willimantic since on or about the 1st day of July, 1873.

During the progress of the work in completing the railroad, neither the town of Chatham, nor any of its officers or agents, claimed any other construction of the vote to guarantee than that assumed to be the correct one by the company, and by the relator and other contractors upon the road ; nor were the company or the contractors notified or given to understand that any other construction of the vote to guarantee would be claimed by the town or its agents ; but, on the contrary the latter recognized the construction put upon it by the company down to the time of the commencement of the present suit.

In the completion of the road under the contracts, for the purpose of obtaining means to carry on the work and to equip the road, the towns of Middletown and Portland passed votes to relinquish their interest in the collaterals issued to them on their guaranty, amounting in the aggregate to $804,000 of the bonds ; and the town of Chatham was requested to likewise release its interest in the collaterals, the second mortgage bonds, so called, which the town was to have for its guaranty, and a meeting of the electors of the town was called for that purpose, and held on the 5th of September, 1872, and adjourned to the 9th, at which the town voted to take no further action on the subject. Another meeting was also called and held for the same purpose on the 25th of September, 1872, at which the town voted " to make no change in their affairs with the railroad company."

On the 10th of February, 1873, a meeting of the town was called, the warning of which stated the object of the meeting as follows :—To act on a petition of Thomas H. Williams and forty-seven others to the selectmen of the town, to see if

the town will vote to rescind the vote passed October 14th, 1871, authorizing and directing the selectmen to endorse and guarantee an amount of second mortgage bonds of the New Haven, Middletown & Willimantic Railroad Company, that shall not exceed in amount the sum of forty thousand dollars, said bonds to be used to aid in the completion of said railroad on and after such time as said railroad shall have been graded, the track laid permanently, and cars shall have passed over said railroad from the city of New Haven to the village of East Hampton in said Chatham." This meeting was duly held, but no action was taken on the subject of the call, the meeting being finally adjourned without day without any vote having been taken upon it. At this meeting the town voted to allow gentlemen from Middletown to address the meeting. The relator offered evidence to show that thereupon the several parties so invited to speak informed the meeting that they represented parties holding the bonds to be guaranteed and the accompanying orders and stated the manner of their obtaining the same, and particularly in the case of the relator, and that they protested against any rescission of the vote, and that the action of the town in refusing to rescind the vote was taken after the protest of these parties. The court rejected the evidence, but if the same was admissible, found that the action of the town in neglecting to rescind the vote was had with full knowledge on the part of the meeting and of the selectmen of all the facts hereinbefore stated.

On the 13th of October, 1873, at a meeting of the selectmen of the town, Allyn M. Colegrove, the treasurer of the company, with its secretary and the relator, appeared before the board, and exhibited to them the said bonds and order held by the relator, and requested of the selectmen that they would place the guaranty of the town upon $5,700 of the bonds, and receive double the amount of the same kind of bonds as collateral security ; but the selectmen declined so to do, giving as a reason therefor that the security was not sufficient, stating that if they would make it sufficient they would guarantee the bonds. The selectmen were then

asked if they had any other reason for their refusal to guarantee, and they replied that they had not.

The second mortgage bonds, so called, were in fact a second series of bonds issued by the company and secured by mortgage. The company issued no bonds to secure which the original second mortgage of their railroad could in fact apply; and unless the vote of the town applies, and was intended to apply, to the bonds in question, the vote is inoperative.

The assets of the company, at the time of the vote of the town to guarantee, including the bonds to be guaranteed, were as follows :

| | | |
|---|---|---:|
| First mortgage bonds un-issued, | - - | $664,500 |
| Second mortgage bonds to be guaranteed, | - | 500,000 |
| Third mortgage bonds to be applied to contractors' old claims, | - - - - | 500,000 |
| Margin on hypothecated bonds, | - - - | 240,000 |
| | | $1,904,500 |

At a meeting called by the town of Chatham, before the day of the meeting when the vote to guarantee the bonds was passed, to consider the question of guaranteeing the bonds of the company, the treasurer and a director of the company attended, but there was no evidence that they were authorized or requested by the railroad company to appear for it; and stated that the cost of the completion of the road would be $1,440,370, and that the assets were as above stated; that there were sufficient means to complete the road and pay the interest on the first mortgage bonds; that the road would be completed by the first day of July following; and that the town would run no risk in guaranteeing the bonds, and that the company would give ample security therefor. These representations were all based upon estimates made by engineers and examined and discussed by the company and committees, and were believed to be true by the gentlemen making them.

Upon these facts the case was reserved for the advice of this court.

*Warner* and *S. A. Robinson*, for the petitioner.

1. As to the constitutional question.—The power of the legislature of this state to authorize municipal corporations to tax themselves in aid of railroads has been so often sustained by our courts that it cannot be questioned. If the legislative department, in its discretion, conceives that the public good is to be served by the grant, the judiciary cannot call it in question. *City of Bridgeport* v. *Housatonic Railroad Co.*, 15 Conn., 475; *Society for Savings* v. *City of New London*, 29 id., 174; *Booth* v. *Town of Woodbury*, 32 id., 128. The granting and exercise of such power has been sustained in the courts of last resort in the states of Vermont, New York, Ohio, Pennsylvania, Virginia, Tennessee, Kentucky, Illinois, Iowa, Indiana, Wisconsin, Missouri, and Alabama, and by the following cases in the federal courts: *Gelpcke* v. *City of Dubuque*, 1 Wall., 175; *Seybert* v. *City of Pittsburgh*, id., 273; *Van Hostrup* v. *Madison City*, id., 291; *Meyer* v. *City of Muscatine*, id., 384; *Rogers* v. *Burlington*, 3 id., 654; *Railroad Co.* v. *County of Otoe*, 16 id., 667. Redfield, in his treatise on the Law of Railways, (ed. 1869, p. 397,) says:—"These questions seem now to be placed completely at rest, so far as the validity of the statutes of state legislatures authorizing towns, cities, counties, and other similar corporations to subscribe to the capital stock of railways is concerned. The question of expediency and even of legality is still discussed as a speculative inquiry, and occasionally we notice a feeble judicial remonstrance."

2. As to the claim that the town's investment in the railroad did not amount to the sum of $40,000.—The respondents contend that the vote is void because the statute authorizing it limited the town to the amount the town then had "invested in the railroad;" and that the town investment is limited to the *cash* the town had actually paid out for stock. The second section of the statute authorized the towns "*severally* to guarantee the payment of bonds, * * to an amount that shall not exceed the sum of $700,000 in the whole; and in no event to exceed the amount of investment '*the said towns*' may already have in said railroad."

But the statute is to be construed so as to effect its object. In terms it authorizes the towns to guarantee such sums as shall not exceed $700,000 in the aggregate. Now, if the term "investment" is to be limited to the stock, it follows that only $553,000 can be guaranteed in the whole, that being the whole amount of the stock taken by the towns. But such a construction cannot be justified. The statute does not limit the expression "investment" to money. Issuing bonds in aid of a corporation is a loan of money. *Commonwealth* v. *Commissioners of Alleghany County*, 37 Penn. S. R., 241; *Rogers* v. *Burlington*, 3 Wall., 654. But the discussion of this question is premature. The vote is to guarantee an amount "*that shall not exceed $40,000.*" If not good for that sum it is good for the $35,000 that the respondents admit that they have invested in stock.

3. The non-negotiability of the guarantee.—The suggestion was made in the court below that a guarantee was not negotiable. It is not easily seen how that question can affect this case. The question here is not whether a guarantee is negotiable, nor as to the effect of the guarantee after being placed on the paper. The guarantee is not yet given, and our present suit is to compel the respondents to give it. The bonds when given will be payable to bearer. By the policy of our modern decisions, railroad bonds where payable to some particular person or officer, are construed as payable to bearer. The title to them passes by delivery. The holder is entitled to sue in his own name. *Society for Savings* v. *City of New London*, 29 Conn., 196; *White* v. *Vermont & Massachusetts R. R. Co.*, 21 Howard, 575; *Chapin* v. *same*, 8 Gray, 575.

4. As to the claim that "the town voted to guarantee the second mortgage bonds of the railroad company, and that the bonds tendered were, in fact, secured by a third mortgage.—The finding of the court is that the bonds contemplated by all parties, and intended by the vote, were those in question. This series of bonds was known by this name by the railroad company, by the town officers, and by the public generally. The court is to construe the vote so

as to make it apply to something. The Superior Court finds that it applies to these bonds, and if not to these, then it can apply to nothing. The vote is inoperative without this construction, and the court will assume any possible construction rather than the one which renders the vote inoperative. The court properly admitted the evidence to show that these were the bonds to which the contract in fact referred. Whatever ambiguity there is, is in the application of the contract, and can be explained by parol. *Selwood* v. *Mildmay*, 3 Ves. Jr., 306; *Goodtitle* v. *Southern*, 1 Maule & Selw., 299; *Hutchins* v. *Scott*, 2 Mees. & Wels., 809; 1 Greenl. Ev., § 295.

5. As to the claim that the avails of the bonds were not to be used until after the road was completed to East Hampton. —The claim is that the vote is a specific appropriation of the avails of the bonds to the completion of such part of the railroad as might remain unfinished after the cars had passed from Middletown to East Hampton village. Such a construction is entirely forced; is without any fact in the case to warrant it; and is against the obvious intention of the parties. The expression " *on and after*," was intended to apply solely to the time when the guarantee should be given, not to the time when the work was to be done upon which the bonds were to apply. The vote should be construed as if it read thus :—" The town authorize and direct the selectmen to endorse and guarantee an amount of second mortgage bonds that shall not exceed in amount $40,000, (said bonds to be used in the completion of said railroad,) on and after, &c." These town votes were passed to effect the completion of the road. The whole road was under contracts required by the towns, and known to be conditionally executed. The road was to be completed by means of them. These contracts appropriated all of these bonds, and the bonds were the funds relied upon. The votes were to afford the company the means to execute them. It cannot be said, in the face of these facts, that the company could not contract to deliver these bonds when they were entitled to receive them. The claim in the answer that the vote contemplated the use of

the *avails* of the bonds after the cars ran to East Hampton, &c., is opposed by the fact that the road could not be completed under the existing contracts without them. The work was to be prosecuted on all points simultaneously; and the vote says nothing about "*avails*" of the bonds.

6. The claim that Douglas had no assignable interest in the bonds or vote.—The claim is that no one else but the railroad company could have any interest in the bonds at the time of guaranteeing them. But the vote was in effect an offer of guarantee to the extent limited to whoever held the order. It was like an offer of guarantee to "whomsoever it might concern." An agreement to guarantee not addressed to any particular person, may be acted on by any one, and bind the guarantor. *Lowry* v. *Adams*, 22 Verm., 160; *Lawrason* v. *Mason*, 3 Cranch, 492; *Russell* v. *Wiggin*, 2 Story, 213; 2 Am. Lead. Cas., 233.

7. The contract is severable. Being passed to aid in the completion of contracts then outstanding, the vote contemplates divers parties who are to receive the guarantee bonds in the execution of the contracts. The vote speaks expressly of the performance of the conditions by the agents of the railroad company. The consideration of the guarantee was several, and moved from several parties; an important circumstance on the question of a joint or several contract. 1 Parsons Cont., 5th ed., 10.

8. A mandamus will lie to protect the relator's interest. The law gives him no other adequate legal remedy. The question is not whether the relator's interest in the subject matter is legal or equitable, immediate or remote, but has he a *specific* right of any character, not shared by the public, towards which the officer or corporation sustains a relation imposing a *legal* duty. If the duty is a legal duty, the remedy may be mandamus. When the authorities say that a mandamus will lie only to enforce "a legal right," they mean a legal obligation or duty of the respondent. In *Ex parte Napier*, 12 Eng. L. & Eq., 452, the court say that "a *legal obligation* is the proper substratum of mandamus." A contract relation is not required to sustain this writ. The

relator's right may be cognizable in a court of equity; it may be of a political, judicial, social, or religious character; but whatever its character, or origin, if a public or corporate officer withholds a legal duty, on his part, towards such right, the writ may be sustained.  The applicant must have some particular right or privilege, independently of that which he holds in common with the public at large.  *Commonwealth* v. *Dickinson*, 30 Brewst. Penn. R., 561; *Heffner* v. *Commonwealth*, 28 Penn. S. R., 108; *Wellington, Petitioner,* 16 Pick., 89; *Sanger* v. *Commissioners of Kennebec,* 25 Maine, 291; *Regina* v. *Southampton,* 1 Best & Smith, 5; 1 Redfield on Railways, ch. 23, "Mandamus;" Angell & Ames on Corp., "Mandamus;" *Regina* v. *Trustees of Balby & Worksop Turnpike,* 16 Eng. L. & Eq., 276; *People* v. *White,* 54 Barb., 627.

*Halsey* and *Calef,* for respondents.

1.  The legislature had no power to authorize the town of Chatham to guarantee the bonds of the railroad company. We are aware that the Supreme Court of this state, as well as the courts of other states, in former years have held that the legislature could rightfully authorize municipalities to aid in the construction of railroads, but of late the best judicial minds of the country have hesitated.  The reasons for denying this right are strongly set forth in the opinions of DILLON, C. J., in *Hanson* v. *Vernon,* 27 Iowa, 28; of DIXON, C. J., in *Whiting* v. *Sheboygan, &c., R. R. Co.,* 25 Wis., 167; of COOLEY, C. J., in *People* v. *Salem,* 20 Mich., 452; and of APPLETON, C. J., in *Allen* v. *Inhabitants of Jay,* 12 Am. Law Reg., N. S., 481; to which last case is added an elaborate note by Judge Redfield in approval of the positions taken. The case of *Lowell* v. *City of Boston,* recently decided in Massachusetts, and not yet reported, is to the same effect. The cases which have sustained the right have done so because,—1st.  Under the principle of eminent domain, courts have held it competent for railroad companies to acquire the right of way *in invitum.*    2d.  On the ground that the construction of railroads is for the public good.  These are the

only grounds, so far as we are aware, upon which municipal aid to railroads has been sustained. We answer that it cannot be sustained on the principle of eminent domain, because,—1st. The company can take the property only upon paying a just compensation in *money;* the general good to the community in which the owner lives is not permitted to be taken into consideration. 2d. It is a proceeding *in rem* against the property desired to be taken. 3d. It only appropriates the *use* of the property and does not absolutely divest the owner of it. 4th. Jurists who have upheld these aids make public good identical with public use. It is conceded that the property of a person cannot be taken from him and appropriated to a private use. This principle is clearly settled in *Taylor* v. *Porter*, 4 Hill, 140, Judge BRONSON giving the opinion of the court, and this doctrine is endorsed in Sedgwick on Constitutional Law, 155 and note. 5th. If these terms are identical, then there is no limitation on the appropriation of private property by municipal legislative action. Manufactories, mills, stores, shops and dwelling houses for cheap rents are all for the public good, and if the terms are identical, appropriations can be made for them as well as for railroads, for they are in no greater sense for the public good. By reason of the confused blending of these terms by the courts, the legislatures of some states have passed laws authorizing municipalities to loan their credit or make gratuities to manufactories and mills established within their limits. This was recently done in Maine. The town of Jay voted to loan its credit to a manufacturing concern if it would remove to that town. Upon an injunction brought to restrain the town, the Supreme Judicial Court denied the power of the legislature to authorize any such appropriation. *Allen* v. *Inhabitants of Jay*, 12 Am. Law Reg., N. S. 481. There must be a *public use* separate and apart from a public good. What is the legal significance of a *public use?* We think it is a use by the general public unobstructed by the intervention of any private right. This is the sense in which we use the term when applied to court houses, school houses, or highways. Every person has the *free* right to *use* them

for the purposes for which they were created without being obstructed by the intervention of the private rights of any person. Another element must enter into this right; there must be not only a public use but also a public exigency existing. This doctrine is laid down by Judge WOODBURY in *West River Bridge Co.* v. *Dix,* 6 How., 545. He says:—
"Nor do I agree that in all cases of public use, property which is suitable or appropriate can be condemned. The doctrine that this right of eminent domain exists for every kind of public use, or for such use when merely convenient, though not necessary, does not seem to me by any means clearly maintainable. It is too broad, too open to abuse."
There was no great public necessity for a railroad through the town of Chatham. 6th. A railroad is a private corporation. It is as essentially private as any corporation created by the legislature. It is true the legislature may have some supervision over railroads, but we apprehend that this will be found to exist under the police power. The legislature cannot compel the companies to build their road, nor change, vary or destroy the rights created by the charter, as they can those of towns, cities and boroughs.—These acts are also sought to be justified under the taxing power. Taxation in the modern sense is of but recent origin. Government was formerly maintained in times of peace by voluntary contributions, and in war by the vassals furnishing men and means. After the decay of feudal customs, the sovereigns resorted to forced contributions, and the people rebelled and extorted from their unwilling rulers the great principle that the property as well as the person of the subject should be free from unwarranted seizure. Webster, in his dictionary, defines a tax as follows:—"A rate or sum of money assessed on the person or property of a citizen by government for the use of the nation or state." Cooley (Const. Lim., 479,) says:—
"Taxes are burdens or charges imposed by the legislature upon persons or property to raise money for *public purposes.*"
And on page 487:—"Taxation has for its only legitimate object the raising of money for public purposes and the proper needs of government; the exaction of money from

the citizens for other purposes is not a proper exercise of the power, and must therefore be unauthorized." See also *Han son* v. *Vernon*, 27 Iowa, 28. The idea of taxation does not contemplate that money should be raised and paid out to a private corporation for the building of a railroad. 7th. The act of the legislature of 1871, under which the town of Chatham voted, introduces a new and dangerous principle. It authorizes towns to engage in an entirely new business, namely, that of endorsing and guaranteeing commercial paper. This is extra-municipal and ought not to be upheld. It will most certainly lead to very dangerous consequences.

2. The act of the legislature giving authority to the towns to guarantee the bonds of the railroad company, conferred unusual and extraordinary powers upon the towns. The towns had no authority to guarantee except what was derived from said act. 1 Dillon Munic. Corp., § 393. It was no part of the duties for which towns were created. The action of the towns therefore to be binding must strictly follow the act. The act authorized the towns to guarantee bonds which the road might issue under the act of the legislature passed at the session in 1871. The towns could not vote to guarantee any other bonds. If they did their action was void. The town of Chatham voted to guarantee *second* mortgage bonds. The bonds issued by the railroad company under the authority of the act of 1871 were not second mortgage bonds. There were two mortgages upon the road at the time ; hence the mortgage made to secure the bonds was a *third* mortgage, and the bonds were *third* mortgage bonds, as they were secured by a third mortgage. The language of the vote of the town is clear and distinct in reference to the kind of bonds they voted to guarantee. There is no ambiguity. No parol testimony therefore can be introduced to explain or vary the meaning of the words used. Fell on Guarantees, (Am. ed.,) 83 ; *Grant* v. *Naylor*, 4 Cranch, 224.

3. The vote is so uncertain in its character that it is invalid and not obligatory upon the selectmen. It leaves it to their discretion to fix the amount. They may limit the amount to be guaranteed, and after they have guaranteed a

one hundred dollar bond, they can stop, and no power can compel them to guarantee more.

4. The vote of the town contemplated that the bonds guaranteed by the town should be used in the completion of the road *after* cars had been run to East Hampton. The town had a right to prescribe such a condition in their vote. They had a right to say *when* they would guarantee, and *where* upon the road the avails of the bonds which the town might guarantee should be used. The language of the vote would clearly imply that no part of the avails of the bonds to be guaranteed should be used west of East Hampton. Douglas bought the ties and they were delivered on the road in December, 1872, and January, 1873, and from anything that appears were used in the road before the cars reached East Hampton. The bonds were delivered to Douglas, December 21, 1872, together with the request to guarantee them.

5. The authority given to the town was, that they might guarantee bonds of the company to an amount not to exceed the amount then invested in the road. If the town had any investment at all authorized by law in the road, at the time of passing the vote, it had only invested $35,000; therefore the vote to guarantee $40,000 is void. The thirty-seven thousand dollars of bonds loaned the company, and for which the town held a mortgage, was not an investment.

6. The undertaking to guarantee is personal with the railroad company, and is not assignable. 2 Parsons on Notes & Bills, 133; *Tyler* v. *Binney*, 7 Mass., 479; *True* v. *Fuller*, 21 Pick., 140; *Belcher* v. *Smith*, 7 Cush., 482; *How* v. *Kemball*, 2 McLean, 103; *Springer* v. *Hutchinson*, 19 Maine, 359; *Irish* v. *Cutter*, 31 id., 536; *Osborn* v. *Hawley*, 19 Ohio, 130. Douglas cannot maintain this action because it was an entire contract to guarantee $40,000 of the bonds. It was made with the railroad company, and cannot be divided up and parceled out to several individuals, giving each a right of action against the town. By the vote, the bonds, after they were guaranteed, were to be handed over to a finance committee of the town, and by them *delivered to*

*the railroad company* on certain conditions to be performed by the company.

CARPENTER, J.   The principal question in this case, whether the legislature has the constitutional power to authorize towns to aid in the construction of railroads, is hardly an open question in this state.    Successive legislatures have assumed the existence of the power, and granted authority to towns and cities to issue bonds, and in other ways to aid in building railroads, and the action of towns and cities pursuant to such authority has been held by this court to be valid and binding.    *Bridgeport* v. *Housatonic Railroad Co.,* 15 Conn., 475 ; *Society for Savings* v. *City of New London,* 29 Conn., 174.    The same principle is recognized in *Booth* v. *Town of Woodbury,* 32 Conn., 118.    The decisions of the Supreme Court of the United States are to the same effect. *Gelpcke* v. *City of Dubuque,* 1 Wall., 175 ; *Rogers* v. *Burlington,* 3 Wall., 654 ; *Railroad Co.* v. *County of Otoe,* 16 Wall., 667.    Whatever therefore we may think of the expediency of its exercise, we are not at liberty to deny the existence of the power.

It is further contended that the town voted to guarantee bonds secured by a second mortgage of the railroad franchise and property, and that the bonds they are now asked to guarantee are secured only by a third mortgage.    The record shows that the first mortgage was given to secure bonds issued by the railroad company, that the second mortgage was given to secure bonds issued by the towns in aid of the railroad ; that the several towns, including the town of Chatham, acting through their respective committees or agents duly authorized, had agreed with each other and the railroad company to release the last named mortgage, so far as the towns were concerned, and that the towns, at meetings duly warned for that purpose, had voted, upon certain conditions, to release the mortgage accordingly, and that the conditions had been complied with.    This action of the towns was ratified and confirmed by the legislature.    It was the understanding that the release of the mortgage was to be executed

by all the towns simultaneously, but it was not executed by any of them. The railroad company, relying upon this action of the towns, and their votes to guarantee bonds, entered into contracts for the completion of the road, issued its bonds, and executed a mortgage in due form for their security. That mortgage described the two prior mortgages, and stated the fact that the towns had voted to release the mortgage given to secure the town bonds. Had the towns in fact released the mortgage, the bonds now in suit would have been practically second mortgage bonds. That is precisely what all the parties contemplated. Hence the bonds were known and called by the parties concerned and by the public generally " second mortgage bonds "; and it is expressly found that whatever may be the proper name of these bonds they " are the bonds which the town of Chatham by its vote intended to guarantee." In order therefore to give effect to the obvious intention of the parties, we must regard them as " second mortgage bonds " within the meaning of the vote.

It is objected however, not very strongly to be sure, that the evidence upon which these facts were found was not admissible. We think the evidence was clearly admissible. It was not offered or received to explain a vote in itself free from ambiguity, but to show the circumstances connected with the transaction, for the purpose of applying the vote to the subject matter contemplated and intended by the parties.

The vote of the town is as follows: " Will the town of Chatham authorize and direct the selectmen to endorse and guarantee an amount of second mortgage bonds of the New Haven, Middletown & Willimantic Railroad Company, that shall not exceed in amount the sum of forty thousand dollars, said bonds to be used to aid in the completion of said railroad, on and after such time as said road shall have been graded, the track laid permanently, and cars shall have passed over said road from the city of New Haven to the village of East Hampton in said Chatham." The defendants claim that, under this vote, the avails of the bonds to be guaranteed can only be used in completing the road after the track was laid permanently, and the cars had passed over the

road to East Hampton; while the plaintiff claims that the expression, " on and after such time, &c.," relates solely to the time of guaranteeing the bonds, and does not limit the use of the avails of the bonds. We think the latter construction is the correct one. The object of the town was to secure the completion of the road to East Hampton. That being accomplished, they received the benefit of their investment, whether the money was used to pay for work done at one time or another. The limitation of the use to any particular time or place was not essential; the whole object was accomplished by fixing a period in the progress of the work before which the bonds should not be guaranteed.

The claim of the defendants that the vote to guarantee bonds to the amount of $40,000 is void for the reason that the amount of stock owned by the town was only $35,000, cannot be sustained. If it be true, as they assume, that the amount *invested* by the town was only $35,000, the vote is not void, but is valid for that amount. But we see no difficulty in regarding the bonds issued by the town, the avails of which were used in the construction of the railroad, as an " investment." The defendants themselves so regarded them, and we think properly. Therefore the vote of the town does not exceed the authority conferred by the act of the legislature, which limits the amount to be guaranteed to the amount invested in the railroad.

We have no occasion to consider the question whether a guarantee, or an agreement to guarantee, is negotiable. This is not an action upon such a contract. It is simply a proceeding in the name and in behalf of the state to compel public officers to perform an official act. The only point of view in which this question can be important in the present case is in determining whether Mr. Douglas has such an interest in the subject matter as that he may be a relator. The view we have taken of other questions in the case renders this question unimportant.

And this brings us to the question whether in this case a peremptory mandamus can properly issue.

The vote of the town was to do one act—to guarantee bonds

not exceeding in amount the sum of $40,000. Not only the time but the manner of doing it was carefully provided for in the vote. The selectmen were to place the endorsement or guarantee upon the bonds; a financial committee was appointed, whose duty it was to receive such bonds from the selectmen, transfer them to the railroad company, and receive in exchange therefor from the company in its second mortgage bonds double the amount so guaranteed. This vote measures and defines the exact duty of the selectmen. They were under no obligation to guarantee bonds in any other way, and had no authority to do so. This proceeding is instituted to compel the selectmen to guarantee only those bonds in which the relator has a special interest. If this can be sustained each of the other parties interested may also resort to this writ. Thus the duty of the selectmen to do a single act, may be made the subject of as many suits as there happen to be parties interested in its performance. There is no necessity for issuing several writs of mandamus to compel the performance of a single duty and we are not aware of any authority that will justify it. As the mandatory clause in the alternative writ follows the application, and as the peremptory writ in this respect must follow strictly the alternative writ, it follows that the peremptory writ cannot legally issue.

The writ, if issued against the selectmen, should command them to perform their whole duty under the vote, and not a part of it merely. That cannot be done in the present case for another reason. Neither the application nor the writ contains an averment that the selectmen have been requested to perform this whole duty, or have ever refused to perform it. It is true the court has found such a request and refusal, but in the absence of any averment to that effect the finding is of no avail. A refusal to do the required act is essential and must be averred. For this reason also this proceeding must fail.

Again—this writ simply requires the respondents to guarantee the bonds in which the relator has an interest, without providing for their subsequent disposition, or that the town

shall receive the stipulated security. If the import of the writ is to require the town to place its guarantee upon bonds belonging to the relator and leave them with him without such security, it is clear that the writ should not issue. If, as may be suggested, a proviso to the effect that the relator should leave with the town the required security may be implied from the whole proceeding, we reply that in a prerogative writ a substantial and material matter like this should not be left to implication. The duty required should be clearly and distinctly stated and the rights of the respondents should be expressly and carefully guarded. In this respect too the writ is fatally defective.

For the reasons last stated we must advise the Superior Court to render judgment for the respondents.

In this opinion the other judges concurred.