IN THE MATTER OF THE APPLICATION OF THE KINGS COUNTY
ELEVATED RAILWAY COMPANY.

*Rapid Transit — chap. 606 of 1875 — General Term in passing upon the report of its commissioners must examine the whole case on the merits — Verification of application to mayor — when sufficient — Mayor's commissioners may report in favor of a road to transport freight, though the application asks for a passenger road only — Consent of municipal authority — when it must be given — Refusal of common council does not bind its successors.*

Upon the application of fifty tax-payers of the city of Brooklyn, the mayor thereof, in pursuance of chapter 606 of 1875, appointed commissioners to determine upon the necessity of constructing an elevated railway therein, and to determine the route thereof. The commissioners having determined that an elevated road should be built therein, and having located its route, and the property owners having refused to consent thereto, the General Term appointed commissioners, who reported in favor of the construction of the said road, and the adoption of the said route.

Upon a motion to confirm the report of the commissioners appointed by the General Term, *held*, that it was the duty of the General Term in passing upon the report of its commissioners to examine the whole case upon its merits, and to do what the property owners ought to have consented to have had done. *i. e.*, to confirm the report if the scheme could be accomplished with equity and fairness, and to refuse to confirm it if that could not be done. (GILBERT, J., dissenting.)

That in determining this question the degree of public benefit which was likely to result, and the amount of private injury that would be inflicted upon the abutting owners if the scheme should be carried into effect, were to be considered, and if the court was satisfied that the injury to be inflicted upon private property and rights would be so great and widespread, as to clearly over-balance all possible benefits to be derived from the construction of the road, the General Term should refuse to confirm the report. (GILBERT, J., dissenting.)

The application made to the mayor for the appointment of commissioners to determine upon the necessity of constructing an elevated railway, and locating its route, was signed by the applicants, and an affidavit made by one of them was annexed to it, in which he stated that he saw the several persons sign the petition; that he knew each of them, and knew their signatures to be genuine; "that he has read the foregoing petition and knows the contents thereof, and that the same are true to his own knowledge, except as to those matters therein stated on information and belief, and as to those matters he believes to be true."

*Held*, that this was a sufficient compliance with the provision of section 1 of chapter 606 of 1875, requiring the petition to be "verified." (Per GILBERT, J.)

Where the application to the mayor asks for the appointment of commissioners to determine upon the necessity of an elevated railway for the transportation of passengers only, the commissioners appointed in pursuance thereof may report in favor of constructing a railway for the transportation of mails and freight as well as of passengers. (Per GILBERT, J.)

After the appointment of the mayor's commissioners, and before the formation of the elevated railway corporation authorized by them, the common council of the city of Brooklyn passed a resolution refusing to consent to the erection of steam railways on any of the routes selected by the commissioners.

*Held*, that this did not prevent the confirmation of the report made by the commissioners appointed by the General Term, because the action of the common council was premature, as the only corporation authorized to construct the road was not then in existence.

That in any event, the common council had no power to bind itself, or its successors, so as to preclude the exercise of the legislative functions entrusted to it by the act of 1875. (Per GILBERT, J.)

Right of the commissioners to give the company the right to select one of several alternative routes, and the effect of the commissioners not fixing any time within which the railroad was to be completed, considered.

MOTION to confirm the report of commissioners appointed by the General Term, under chapter 606 of 1875, to report upon the construction and location of an elevated railway in the city of Brooklyn.

Upon the application of fifty tax-payers of the city of Brooklyn the mayor thereof appointed five commissioners to determine upon the necessity of constructing an elevated railway therein and to determine the route thereof. The commissioners having reported in favor of the construction of a road, and determined its route, the

property owners refused to consent to it. Thereupon, on the application of the Kings County Elevated Railway Company, the the General Term appointed three commissioners, who reported in favor of the construction of the road, and it was their report which was now sought to be confirmed.

The application to the mayor was signed by the applicants, and attached to it was an affidavit, sworn to by one of the signers before a justice of the Supreme Court, in which he states that he saw the several persons whose names were affixed to the petition sign the same ; that he knows each and every of them, and that such signatures are genuine ; " that he has read the foregoing petition and knows the contents thereof, and that the same are true of his own knowledge, except as to those matters therein stated on information and belief, and as to those matters he believes to be true."

After the appointment of the mayor's commissioners, and after they had determined upon the necessity of constructing an elevated railway, and determined upon its route, and before the organization of the corporation by which such road was to be constructed and operated, the common council of Brooklyn passed a resolution refusing to grant its consent to locate steam railways on any and all of the routes fixed by the commissioners.

In July, 1879, the General Term made an order confirming the report of the commissioners, DYKMAN, J., delivering the opinion, which is reported in 18 Hun, 378.

It appears that the motion to confirm the report had been made and heard at a General Term, when three judges were present. No decision was then made, and the General Term adjourned to a subsequent day. In the meantime one of the judges left for Europe, and was not present upon the adjourned day. On that day a memorandum was filed with the clerk of the court, the same as if all the judges who had heard the motion were present, stating that the report of the commission was confirmed, one of the justices present writing an opinion in favor of confirmation, and the other dissenting. Upon a motion made to vacate the order of confirmation, and to amend the record so as to show that one of the justices was not present, an order was granted correcting the minutes, by stating that such justice was not present at

the court when the decision was made; that the justice not there had sent to the chief justice a declaration or statement in writing that the said report should be confirmed; that there was no written concurrence of such absent justice in the opinion written, and no personal consultation with either of the justices present, with the justice who was not, prior to or at the time of the entry of the order of confirmation. The order denied the motion .to vacate the order of confirmation. Upon an appeal therefrom, the Court of Appeals held that the decision of the General Term was wrongfully made, as the two justices who were present did not concur in making it, and as the third had not con- sulted with them or either of them, and ordered that the case should be sent back to be reargued.

Upon such reargument this decision was made.

*Henry J. Scudder* and *James Emott*, of counsel, and *Gilbert* and *Cameron*, attorneys for the Kings County Elevated R. R. Co.

*William C. De Witt*, for the owners on Fulton street.

*Winchester Britton*, on behalf of owners fronting on Myrtle avenue.

*Edgar M. Cullen*, attorney for himself and E. M. Cullen.

*B. F. Tracy*, in opposition to motion to confirm.

PRATT, J. :

The determination of the commissioners which this court is now asked to confirm is to the effect that an elevated railway, according to the specified plans, etc., ought to be constructed and operated upon the following streets and avenues in the .city of Brooklyn : Fulton street, Water street, Adams street, Myrtle avenue, Broadway, Washington street, Hudson street, Flatbush avenue, Fourth avenue, Atlantic avenue, Hamilton avenue, Prospect avenue, Ninth avenue, Nostrand avenue, Lexington avenue, Franklin avenue, Twelfth avenue, Division avenue, North Fifteenth street, Green street, Meserole avenue, Franklin street, Commercial street, Manhattan avenue, Sands street, Prospect street, York street and Main street.

A few of these streets are devoted to the purpose in view, for short distances, but nearly all of them are to be invaded throughout their entire length by the projected railway. This list includes all the principal thoroughfares of the city. On one of the streets named, property of the assessed value of $15,000,000 is situated, and, doubtless, more than $50,000,000 in value of real estate would be immediately and most seriously affected by the construction of the entire railway as laid out by the commissioners.

It appears that the descriptions contained in the title deeds upon one of the principal streets are such as to give only a small portion of the present owners any claim to the land beyond the sides of the street, and, no doubt can be entertained but that most of the property on all the other streets is in a similar situation.

The structure proposed to be erected is to have its pillars within the curb line, and its cross-girders to cover with trestle work, the entire roadway of each street.

Two streets are given in the alternative. In one of them the construction is dependent upon a future contingency, and upon others it is postponed. In some cases no time whatever is fixed for its completion, thus giving to the company the whole period of its chartered life in which to carry out the plan proposed.

While it is apparent that so extensive a project must make a wonderful change in the city at large, and entail incalculable damage to some of the abutting property, no adequate provision has been made for any contribution to the city treasury for the enjoyment of this valuable franchise, and the owners of private property are left for indemnity exclusively to proceedings at law, under a system of jurisprudence not yet adapted to such an exercise of the power of eminent domain.

It is proper to consider not only the inevitable consequences that will result from the construction and operation of this road, - as mapped out before us, as an entire scheme, but those also which will result from the possession by the railroad company of the right without the obligation to build.

Here is a proposition to do a thing which certainly will affect property one way or the other. It may benefit some. It may

injure some. If the company was bound to build certain advantages might arise to the property affected which might offset the disadvantages. But the right to build is in the nature of an easement, and a cloud upon all the property situated upon such streets. It would injuriously affect its sale in the market and prevent permanent improvements thereon. This corporation has the option literally to gridiron the city of Brooklyn with a structure sufficiently strong and cumbersome for a *freight railway*. It may impair the property; it will embarrass if not prevent rival enterprises and thus fasten upon the community all the evils of a gigantic monopoly.

It is questionable if the scheme proposed would be a public improvement. Is it not true that so many advantages given to this company, and so many burdens placed upon the property owners by this scheme, will render it, as a whole, rather a public misfortune than a benefit? Will it not retard rather than advance any system of rapid transit which shall fairly distribute its advantages among all our citizens?

Is it said that these views affect the public interests rather than the private rights of the abutting owners? This may be true in one sense, but it nevertheless shows that the public interests are in harmony with the rights of the owners upon these streets which are to be incumbered by the option, without the benefit of the obligation to build this road. While some of these questions were properly submitted to the commissioners appointed by the mayor and the common council, they may be all considered by the court in determining whether the benefits to accrue from building this road outweigh the damage likely to result to abutting owners and the public.

We come now to the question of the duty and power of the court in respect to this proceeding. It is with a good deal of hesitation that I have come to the conclusion that it is our duty to examine the merits of the question presented, and to give or withhold confirmation, as shall seem wisest to us under all the circumstances.

Assuming that an elevated road is a necessity, that the routes are proper and that the scheme has progressed substantially as required by the statute, to the point where our confirmation is

required to enable the corporation to go on with the construction of the road, and assuming, further, that this court can act in this matter only in a judicial capacity, I am not satisfied that the weight of evidence, as it appears before us, sustains the determination made by our commissioners.

It is true that many opinions and prophecies were indulged upon the hearing below, but even these related almost entirely to a very few streets, and were favorable, not especially to the entire scheme, but to rapid transit generally upon certain streets named. There is scarcely anything in the case (excluding the actual inspection made by the commissioners) which rises to the dignity of evidence in favor of this report. On the other hand the evidence is abundant and conclusive that the proposed scheme, if carried out, will result in irreparable public and private injury.

It is not necessary to quote the testimony. It is only necessary to distinguish the statements in favor of rapid transit generally from those in favor of this particular plan, to see that the determination of the commissioners is not in accordance with the weight of evidence. Can it be said that the evidence furnished by the inspection of the proposed routes by the commissioners should outweigh the sworn testimony of witnesses with equal or superior means of knowledge? If that is the law, it would follow that in no case where the senses of the commissioners are made to testify could the court interfere to reverse their report upon the facts?

The general rule is that the court will not review the decision of a commission as to the value of property requiring personal inspection, examination of witnesses and knowledge of the amount, character and situation of property taken; but this rule which arises out of the necessities of a multitude of controversies and dependent for a just settlement upon a minute investigation into details, was adopted in furtherance of justice, and not with a design to deprive the court of an exercise of its own judgment upon any great question of public policy squarely presented, or to prevent the court from rejecting a report leading to an undoubted private or public wrong.

Suppose, for example, this report had embraced every street in the city, could it be denied that the court could look into the

merits and reverse a determination so manifestly wrong ? If this power exists in an extreme case, it exists also in one where the injuries and advantages are more evenly balanced.

But it is not clear that we are acting in this matter purely in a judicial capacity. This is not analogous to a proceeding to condemn lands for railroads, streets or other public purposes. In these cases the power of eminent domain has already been exercised, and nothing is left for the courts but to assess by commissioners the amount of compensation to be paid. Take the case of a railroad company applying for a commission to assess damage for land required by it. The law has already conferred upon the company the right to take the land necessary for its corporate purposes ; but in this case the legislative grant of power to build the road has not been made. The condition (*i. e.*, the consent of the property owners) has not been performed.

The appropriation of property for railway purposes is an exercise of the right of eminent domain. The power to exercise this right resides in the Legislature. It may be delegated by general laws to certain officers. An illustration of this is furnished in this matter where the question of the necessity of an elevated railroad and the details of its organization is delegated to commissioners to be appointed by the mayor.

The exercise of this right always involves compensation for property actually taken. The means by which the compensation is to be ascertained and made are judicial, but the determination of the necessity for the exercise of the power and the act of taking are not judicial acts, and cannot be made so by delegating the authority to decide this question to a court, to its judges or to their appointees.

If this is an administrative question and is so involved with danger to private rights and property that, from motives of public policy, the Legislature decided that the approval of the General Term of the Supreme Court should be obtained, as a substitute for the consent of the property owners, before the right to construct the railway shall accrue, then it follows that the court, in determining the question, is bound to consider all the merits involved, and to do what the property owners ought to have done, *i. e.*, to confirm, if the scheme can be accom-

plished with equity and fairness, and to refuse, if that cannot be done.

In determining the intent of the people, as expressed in the constitutional provision upon this subject, it is important to keep in view the rule of law which existed at the time of its adoption, viz. : That only those whose property was *actually* taken could claim damages resulting from the exercise of the power of eminent domain. It was in view of this anomalous condition of the law that the constitutional provision and the rapid transit act were passed. They recognize the fact that rapid transit would be confined chiefly to the cities where the streets are in some instances owned by the municipal corporation, and are also under the control of the municipal authorities, and where the anomalous condition of things was most likely to operate with the utmost rigor upon private rights.

Recognizing the difficulties, the Legislature say by this enactment: We will not permit any corporation to build an elevated road along a public street upon the simple consent of the public authorities. We recognize the rights of the owners of abutting property, and the legislative power of eminent domain shall not be employed without the consent of at least one-half of these parties who are to be the most deeply affected thereby.

It is not the consent of the commissioners appointed by the mayor, nor the consent of the street authorities, nor yet the consent of the property owners which constitute the condition precedent to the legislative consent. It consists in a concurrence of all these elements. The consent of the last is as essential as all the rest. Hitherto the consent of the street authorities or the Legislature was enough, and the property owners were left to their remedy at law, if any they had; but that is not enough. The property owners must consent before the legislative authority attaches to the scheme. It therefore follows that before the consent of the property owners or its equivalent is obtained no question, except a purely legislative one, can arise.

The motive for this condition was the protection of the property owner from threatened injury to his property without a *certainty* of a remedy. This act recognizes the legislative power to legalize a structure which would otherwise be a nuisance. This

is a power to inflict a remediless injury. It recognizes, also, the possible need of new and advisable improvements of this character.

In balancing the possible private dangers against probable public advantages of such improvement, the Legislature refers the *matter of its own consent* to the parties who are likely to suffer, and arbitrarily provides that, if half of them approve, the plan may be executed. If they refuse, then the scheme is *defeated* until the justices of this court, among others, shall consent for them and in their place. In the light of these considerations, what is the substitute for this consent? Does it consist in the determination of the commissioners, or in two things, both as much as either, to wit: the determination of the commissioners *and* the confirmation by the General Term?

There must be the determination *and* confirmation before the legislative consent is given. It is in this respect precisely as if the Legislature had authorized its own commissioners, instead of the mayor's appointees, to examine the question of necessity to adopt plans, etc., and report the same back to the Legislature for its action. In such case it is plain that until the Legislature itself consented to the building of the road, no judicial function could be exercised. If these views are correct, the act of confirmation precedes any judicial function.

It may be farther observed, that the clauses of this act which prescribe the duties of the mayor's commissioners contain no provision for the confirmation of their determination. Their decision, upon whatever is delegated to them, is final and complete. This shows that the act of our commissioners was incomplete and worthless, until this court had determined the question for itself. Our "confirmation" is required. This is not a mere perfunctory duty, but implies an examination of the whole subject by which alone we are enabled intelligently to ratify or disaffirm their determination.

The confirmation of this court is a power reserved by the Constitution, upon the exercise of which the legislative authority to construct the road depends. Considering the question in this view, and adopting the determination of the mayor's commissioners as if the same was embodied in a legislative enactment, it seems our duty to decide, as the Legislature might do if the

question was referred back to that body for determination, whether a sound public policy requires a confirmation of this report.

The degree of public benefit which is likely to result and the amount of private injury which will be inflicted upon abutting owners from this scheme, if sanctioned, and a comparison of these matters of fact are material elements in this determination. If the court is satisfied that the injury to be inflicted upon private property and rights is so great and widespread as to clearly overbalance all possible benefits to be derived from its construction, then confirmation ought to be refused.

It is too apparent to require argument that a person may be grossly injured in his property when none of his legal rights are invaded. A familiar illustration is the building and operation of a street railway. But, in the case of the illustration put, the injury is very limited in extent as compared with that which this rapid transit project will entail. The noise, obstruction, deprivation of light and air and other kindred annoyances, will subject many private owners abutting the proposed routes to enormous losses for which no compensation is provided.

It seems to us, whether we view this proceeding upon the evidence, in a judicial capacity, or in a broader sense of legislative commission, that the construction and operation of this road, under the proposed plan, will inflict injuries upon the property in front of which it will pass to such an extent as to outweigh the public interest and necessities in having this scheme carried out.

The constitutional provision and rapid transit act have been carefully considered in the *N. Y. Elevated R. R. Case*, and the meaning thereof fully declared, except as to the question of the power of the General Term to examine and pass upon the merits of the report of its commissioners. The General Term in that case did confirm the report upon the merits.

It is not necessary to advert to the technical questions raised on this motion, as the foregoing views, if correct, are decisive of the whole matter. As this is a matter of great public concern, we deem it not improper to say that we are fully alive to the need of rapid transit in this city, and anxious that its citizens may enjoy all its advantages at the earliest practicable moment ; but

we cannot acquiesce in a wholesale surrender of so many important highways to so burdensome a structure, and in allowing the petitioner ninety-nine years in which to finish it, unaccompanied with any terms for the benefit or security of the public and private interests involved.

BARNARD, P. J., concurred.

GILBERT, J. (dissenting).

This is a motion to confirm the determination of the commissioners appointed by this court in the above entitled matter, namely, that the railway named ought to be constructed. The motion was properly made by the railway company, and it was made at a proper time. (*Elevated R. R. Cases*, 70 N. Y., 327, *et seq.*)

The principal objections to such confirmation, are : 1. That said railway would inflict great and irreparable injury upon the interests of the owners of the property which abuts upon the streets selected for the routes thereof, and upon the public interests of the city of Brooklyn ; and 2. That the proceedings of the commissioners appointed by the mayor of said city to fix and determine the routes of said railway were not, in several particulars, comformable to the statute under which they acted. No complaint has been made of the conduct of the commissioners of the court, or of their proceedings in any material respect.

It seems to me to be sufficient to say, in regard to the first objection, that the public authorities, to whom the constitution has specially confided the defence of the public interests involved in this subject, have consented to the construction of the railway, and that the mayor's commission, a body specially selected pursuant to law and which the Legislature interposed as a protection of both public and private interests, determined that there is a necessity for the railway in question. That determination is equivalent to one made by the Legislature. Such is plainly the effect of the statute which governs the subject, and so the Court of Appeals held in the *New York Elevated Railway Case* (70 N. Y., 344). Neither the constitution nor any statute has conferred upon the court the power of reviewing that determination. The

determination of the commissioners of this court that such railway ought to be constructed should, therefore, be confirmed, unless we have power to review the evidence before us, and such evidence is sufficient to show that, although a necessity exists for some elevated railway, the particular one in question ought not to be constructed. I think that the evidence is quite insufficient for that purpose. It rests principally upon opinions in respect to the consequences which it is supposed will follow the construction of a railway not yet begun. Such opinions are rather in the nature of prophecy than of evidence. Nor is there a balance of opinion against the determination of the commissioners. On the contrary, the preponderance of testimony (if testimony it can be called) is the other way. The record discloses an entire unanimity of opinion in favor of "rapid transit," and all, or nearly all, the witnesses agree that it would be beneficial to the city. The gist of the objection appears to be to the location of a steam railway in some of the streets selected by the mayor's commission. But it is apparent that if the construction of the railway through the streets selected would produce the consequences apprehended, a construction of such a railway in other streets would produce similar consequences. The injury to private owners and to the public interests, if any should accrue, would be varied in degree only ; so that this objection after all is merely an appeal for the protection of one set of interests at the expense of others. For the court could not lawfully frustrate the statute which authorizes the construction of elevated railways by making a decision which, if carried to its logical consequence, would exclude railways from the city entirely. The sustaining of this objection could create a precedent which, if followed, would produce that result. It is urged that the absence of any provision for compensating abutting owners is a good reason why the report should not be confirmed. The answer to this suggestion is : (1.) That the constitution provides that no private property can be taken for the use of the railway, without making compensation therefor ; and (2.) That if the constitution does not entitle the owners to compensation for property injuriously affected, but not actually taken (a question which we are not called upon to decide), the lack of any provision for compensating them is attributable to the

Legislature alone. In the absence of a constitutional requirement on this subject, it was the province of the Legislature exclusively to determine whether compensation should be made or not. To hold that the statute ought not to be enforced, because the Legislature failed in their duty by omitting a provision for compensation, would be an unwarrantable assumption of legislative functions. The argument that the power conferred upon the court was intended as a shield against reckless or corrupt legislation is, I think, unfounded. The intention to make such a fundamental change in the distribution of powers by the constitution is nowhere manifested. The language of the amendment of the constitution in 1875 is perfectly plain, and it affords no countenance to the idea that such a fundamental change was intended by the people. The proceedings of the bodies, under whose auspices the amendment was framed, are not satisfactory guides to any interpretation thereof different from that which the words import. For, as the constitution does not derive its force from the body which framed, but from the people who adopted it, the intent to be ascertained is that of the people, and it is not to be supposed that they adopted it in any other sense than that which is obvious to the common understanding of men. (Cool. Const. Lim., 66; Sedg. Const. Law.) I think the intention of the people is sufficiently expressed. They intended to subject the report of the commissioners of the court to the same mode of review as the law then existing had provided for analogous cases, such as the laying out of streets and parks, the establishment of railroads and boulevards, the bonding of towns, etc., etc. The power to confirm or reject the report of the commissioners arises out of a simple enlargement of the jurisdiction of the court. It was formerly held that a similar power conferred in similar terms upon the court did not enlarge its jurisdiction, but merely made its members commissioners to execute the power. *Matter of Beekman St.*, 20 Johns., 269; *Matter of Mount Morris Square*, 2 Hill, 14.) But that doctrine was a long time ago exploded, and it is now settled that in executing such a power the court acts as the court established by the constitution, and not as an inferior statutory tribunal. (*Striker* v. *Kelly*, 7 Hill, 9; *Matter of Canal and Walker Sts.*, 2 Ker., 406; *Matter of New York Central and Hudson*

*River Railroad Company*, 64 N. Y.. 60.) It follows that, in reviewing the action of the commissioners, the court must exercise judicial powers only, and in determining the questions presented must be governed by the rules of law applicable to the case. It cannot act as a commission to settle engineering questions or matters of administration or of public policy. The question whether the consent of the property owners ought to be given is one of administration merely. It depends solely upon the consideration of the public advantage on the one hand, and of injury to owners of private property on the other. Such a question cannot be subjected to the operation of abstract rules of law, but in the nature of things must be determined by the judgment of practical men. To enter upon considerations of that kind would be a palpable usurpation of the functions of the two boards of commissioners. All that the court can do is to confine the commissioners within the limits of the powers conferred upon them, to decide whether their proceedings have been just, impartial and conformable to law, and whether their determination was affected by any improper evidence or by other illegal means. The language of the constitution and of the statute exclude the idea that the court may reject the determination of the commissioners honestly made, because it differs in opinion from them. Both require that the actual determination shall be made by the commissioners. The court can only confirm it; that is, make it firm or valid, or refuse to confirm it. In deciding that question the court cannot, from the nature of the case, review the exercise fairly and in good faith by the commissioners of their judgment in making their determination. Such judgment may be legally made up partly by their own observation of the routes of the railway, and partly by the testimony of witnesses and statements made before them. " The senses of the commissioners are made to testify. The information thus acquired it is impossible to bring before the court of review. The commissioners, too, are selected with reference to their general knowledge, qualifying them to judge discreetly upon the matters submitted to them. Unlike a jury they are restricted to no particular sources of information. They may collect information in all the ways which a prudent man usually takes to satisfy his own mind, but at last

they must be governed by their own judgment." In reviewing their report the court can act only upon facts. There must be something like demonstration that the commissioners have fallen into error to justify a refusal to confirm their report. (*In re William and Anthony streets*, 19 Wend., 694; *Troy and Boston Railroad Company* v. *Lee*, 13 Barb., 171.) Nor can the court substitute its own judgment for that of the commissioners, no matter how strong its convictions may be that the commissioners should have come to a different conclusion. The plain language of the constitution and of the statute shows that the people and the Legislature intended that the judgment of the commissioners appointed by the court, made conformably to law, should be final and conclusive. These propositions, I think, have been adjudicated by the Court of Appeals in the *Matter of the N. Y. Elevated R. R. Co.* For the court there held (70 N. Y., 359) that " whether the benefits to follow from the construction of the road were such as to counterbalance the injury which should be done to the private interests from its operation was a question properly before both sets of commissioners, and with their determination of it the court could not, or at least ought not to interfere." That is the precise question which is primarily involved in this case. No doubt the power which the Legislature unquestionably possesses of authorizing the construction of elevated railways, like many other powers vested in them, is liable to great abuse. But supreme power must be vested somewhere. The old question, " who shall guard the guardian," has not yet received a satisfactory solution in any political system. In a representative government like ours, however, the only answer that can be given to it is, that the people must rely for protection upon the power which they possess, and may exert at short intervals, of choosing the persons who shall, from time to time, be the guardians of their rights and interests.

The next objections are of a formal kind, relating to the proceedings before the mayor and to the action of the commissioners appointed by him. I am inclined to the opinion that such objections cannot be urged at this time, but that they have been waived by the omission to raise them in opposition to the appointment of the commissioners of this court. It is not necessary, however, to

dispose of these objections upon that ground, as I am of opinion that none of them are well taken.

The verification of the application to the mayor is in the form usually adopted in like cases, and was, I think, sufficient. All that the statute requires is that the application shall be verified upon oath. It does not require the oath of each applicant, as in some analogous cases, e. g., the general highway act, where a certificate by the oath of twelve reputable freeholders is required. (2 R. S. [6th ed.], 152.) No doubt the Legislature intended the same kind of verification as is required by the general railroad act, namely, one according to the rules and practice of this court. The applicants all having one and the same interest, a verification by one was a compliance with such rules and practice. The statute does not require that the application shall show that the applicants were authorized to make it. The application, it is true, is required to be made by fifty reputable householders and taxpayers, but the statute does not prescribe the means by which the mayor shall ascertain that the applicants are of that class, and it is quite improbable that the Legislature intended that each applicant should make oath respecting his own repute. The mayor determined that the applicants were reputable householders and taxpayers. I think, therefore, that it must be presumed that the mayor either knew or ascertained that fact in some legal mode, although it is not stated in the application.

It appears that the application to the mayor showed the need of a railway for passengers only, and that the appointment of commissioners made by him had reference to such a railway. The mayor's commissioners, however, reported in favor of a road for the transportation of mails and freight as well as passengers. The language of the statute is disjunctive, and authorizes the appointment of commissioners whenever it shall appear that there is need of a railroad for passengers, mails or freight. The statute does not restrict the authority of the commissioners to a railway adapted only to the purpose specified in the application. On the contrary, it invests them with full power and authority to do and provide, all that the statute directs them to do and provide, whether the application referred to all the purposes aforesaid or only one of them. Among the powers thus conferred upon the

commissioners is that of forming a corporation, and the statute grants to the corporation so formed power to convey persons and property. In short, the mayor's commissioners have the same powers whether the application for their appointment declares the need of a railway for the transportation of passengers, mails and freight, or of passengers only. I am of opinion, therefore, that the variance between the application and the report of the commissioners is quite immaterial.

I think that the notice inviting the submission of plans was a sufficient compliance with the statute. It is headed by the usual designation of the office of the commissioners, giving the street and the number of the building in which it is situated, and it specifies the time when they will meet to decide upon the plan or plans for the construction of the railway. The statute makes no provision for a hearing. Any person desiring to be present at the meeting could hardly be misled respecting the place designated therefor, and as no person had a right to be heard at the meeting, I think the statute required the notice to be given merely for the purpose of apprising the public when the time for presenting plans would end, and when the commissioners would decide upon them. Moreover, such provisions in statutes are directory only, and the law does not avoid subsequent proceedings under the same statute for a non-compliance therewith. (Cool. Const. Lim., 75 and cases cited; *Ma chant* v. *Langworthy*, , 6 Hill, 646; *Striker* v. *Kelly*, 7 id., 24; *People* v. *Cook*, 14 Barb., 290; *S. C.*, 8 N. Y., 67.)

It is objected that the commissioners did not locate the turn-outs, stations, etc., of the railway. But the statute contains no such requirement.

Another objection relates to a supposed conflict between the plan for a railway fixed by the mayor's commissioners, and the suggestions respecting the operation of the railway at particular places made by the commissioners of this court. This objection assumes that the report of the mayor's commission requires that crossings shall be at the same grade, thus violating the statute governing their action; that it fixes the height of the structure at crossings and places of connection, and requires that trains upon Myrtle avenue and Fulton street shall be run upon the same

tracks to and from the Fulton ferry. But that is not the case. The recommendations of the Supreme Court commissioners that crossings be upon different grades, and that certain trains be run upon independent tracks, cannot be regarded as conflicting with a plan which defines nothing upon these subjects. The Supreme Court commissioners did not exceed their authority in making such recommendation, for the power to determine that the railroad ought to be constructed includes the authority to add such necessary qualifications to the determination. That principle was decided by this court in the *Matter of the N. Y. El. R. Co.* (7 Hun, 243), and affirmed by the Court of Appeals (70 N. Y., 358).

I perceive no legal ground of objection to the action of the mayor's commissioners in giving to the railway company the option of adopting one of several alternative routes designated, or what is, in substance, the same thing, fixing two routes and then providing that if the railway should be constructed upon one of such routes it need not be constructed upon the other. Similar action was expressly sanctioned by this court and the Court of Appeals in the *New York Elevated R. R. Case* (70 N. Y., 358).

It is urged that the report before us should not be confirmed because the common council of Brooklyn, in August, 1878, refused to grant its consent to the construction of the proposed railway. There are, as it seems to me, two answers to this objection : 1. When the refusal was made, no consent had been asked. The corporation which has the sole authority to construct the railway was not then in existence, and yet it alone required or could receive such consent  The action of the common council at that time, therefore, was premature.  2. The common council had no power to bind itself or its successors so as to preclude the exercise of the legislative functions intrusted to that body. (*Brick Church Case*, 5 Cow., 538; *Mayor* v. *Britton*, 12 Abb., 367; *Same* v. *Second Ave. R. Co.*, id., 364.) The case of *Musser* v. *Fairmount, etc., R. Co.* (5 Penn. Law Jour. Rep., 466), is not an authority on this subject, because in that case the act incorporating the railway company contained a proviso whereby the grant of the right to use the streets was made dependent upon the condition that the consent of the councils of the city of Philadelphia should be obtained. The act also provided that such

consent should be taken and deemed to have been given, if said councils should not, within thirty days after the passage of the act, by ordinance duly passed, signify their disapproval thereof. It will be observed that the councils were expressly authorized to pass the ordinance refusing consent, and that they were required to do so within thirty days in order to prevent the taking effect of the legislative grant. If they disapproved of the railway, it was their duty to refuse their consent within the time limited, for otherwise the grant of the right to use the streets, which was made upon condition that such consent should be obtained, would take effect. The condition attached to the grant of the right to use the streets in the case before us is the same in effect as that in the *Philadelphia Case*, but it is without limitation as to the time when the consent of the public authorities may be obtained, nor are the public authorities required to act at any time in order to avoid an implication of their consent.

In the case of the *Supervisors* v. *Galbraith* (9 Otto, 214), a statute of Mississippi authorized a county to subscribe to the capital stock of a railroad company provided that at an election, of which twenty days notice should be given, a majority of the qualified electors voting should be in favor of the subscription. The proposition when first submitted was rejected, but at a second election it was carried. The Supreme Court of the United States held as follows : " There is no limitation as to the time when, or the number of times, the voters might be called upon to decide the question of subscription. We cannot recognize any restirction as to the latter without adding to the statute what it does not contain. Our duty is to execute the law not to make it." To the same effect is the case of *The Society*, etc., v. *New London* (29 Conn., 174).

The action of the common council of Brooklyn referred to was uncalled for and unnecessary to protect any right of the city. The report of the mayor's commission was transmitted to him not in obedience to a statutory requirement, for there was no such requirement, but as an act of curtsey merely. The mayor was not required or authorized, except as an act of curtesy to send the report to the common council. The document did not legally thereby come before that body for any

official action thereon, and their action upon it was gratuitous and ineffectual.

There are other minor objections, all of which have been examined, but none of them deserve particular notice.  Having found no tenable objection to the confirmation of the report it should be confirmed.

Present — BARNARD, P. J., GILBERT and PRATT, JJ.

Report of commission not confirmed.